UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LARSON MANUFACTURING COMPANY OF SOUTH DAKOTA, INC., SUPERIOR HOMES, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> WESTERN SHOWCASE HOMES, INC., AMERICAN MODULAR HOUSING GROUP, LLC, AMERICAN MODULAR HOUSING GROUP, INC., PAUL THOMAS, <br><br> Defendants. | 4:16-CV-04118-VLD <br><br><br> MEMORANDUM OPINION AND ORDER DENYING MOTION TO QUASH SUBPOENAS, OR FOR PROTECTIVE ORDER, DOCKET NO. 86 |

**INTRODUCTION**

This matter is before the court on the basis of diversity jurisdiction, 28 U.S.C. § 1332, after defendants removed the matter from South Dakota state court. See Docket No. 1, 1-1. The parties have consented to this magistrate judge handling their case pursuant to 28 U.S.C. § 636(c). Now pending is Salvatore Torresco, Laura Riffel, and Guardant Investment's ("the movants'") motion to quash subpoenas or for a protective order. See Docket No. 86. Plaintiffs oppose the motion. See Docket No. 95.

# FACTS

## A. Background Facts and Claims

The court states the following facts from plaintiffs' second amended complaint in order to evaluate movants' pending motion. Plaintiff Larson Manufacturing Company of South Dakota, Inc. (Larson) is the parent company of plaintiff Superior Homes, LLC (Superior). See Docket No. 58 at p. 1. Both are South Dakota business entities. Id. Superior is in the business of manufacturing and selling modular homes. Id. at p. 2.

Defendant Western Showcase Homes, Inc. ("Western") is a Nevada corporation in the business of purchasing, reselling, and financing modular homes. Id. at p. 2. Defendant Paul Thomas, a Nevada resident, is the sole member of American Modular Housing Group, LLC (AMHG, LLC), a Nevada company in the business of buying and reselling modular homes. Id. American Modular Housing Group, Inc. (AMHG, Inc.), is a Canadian corporation with its principal place of business in Nevada that also buys and resells modular homes. Id. Thomas is the principal agent and owner of both AMHG entities. Id.

The defendant entities purchased modular homes from Superior and then re-sold those homes to customers, sometimes arranging for delivery, set and completion of the home at the customer's location. Id. at pp. 2-3. Larson and Superior extended credit to the defendant entities for these purchases; AMHG would then repay the loans when its customer paid the defendant entities. Id. at p. 3.

The second amended complaint recites that defendant entities placed orders for fourteen modular homes with plaintiffs. Plaintiffs constructed the homes. Of the homes that were delivered to defendants, full payment was never made even though the complaint alleges the ultimate customers who received these homes paid defendants. Other modular homes ordered by defendants were custom-built and never delivered because defendants never paid for the homes. As to the homes plaintiffs retain possession of, plaintiffs allege the custom nature of the homes makes resale of the homes at a reasonable value impracticable.

In addition, Larson entered into a loan agreement with Western which was guaranteed by AMHG, Inc. This loan agreement ultimately encompassed $14 million in funds. Larson alleges that Western defaulted on the loan and AMHG, Inc. refused to pay pursuant to its guarantee. For all these matters, plaintiffs assert three counts of breach of contract, two counts of fraud, two counts of conversion, one count each of debt and guarantee, and one count of piercing the corporate veil.[1] Plaintiffs also allege defendant Thomas converted

---

[1] The plaintiffs' first amended complaint contained several additional claims. See Docket 1-6. During the course of this litigation in federal court, however, the parties reached a settlement agreement regarding several of the claims contained within the first amended complaint and the defendants' counterclaims against the plaintiffs which were associated with those settled claims. As a result of the settlement agreement, the parties agreed to dismiss the affected claims/counterclaims in this lawsuit. Plaintiffs eventually moved to compel enforcement of the settlement agreement (Docket 31), and the court granted that motion. Docket 50. Thereafter, the plaintiffs filed their second amended complaint, which appears to have deleted the claims which are the subject of the settlement agreement. Docket 58. Likewise, the defendants filed their amended counterclaim, which appears to have deleted the counterclaims which are the subject of the settlement agreement. Docket 57.

money which was received from third parties and intended for plaintiffs, but was instead used by Mr. Thomas for his own personal use. See Docket No. 58 at ¶¶ 15, 20, 49- 51.

In their answer to the second amended complaint, defendants generally deny nearly all of plaintiffs' allegations. See Docket No. 62. Defendants Western Showcase, Inc., and American Modular Housing Group, Inc., assert five counterclaims against Larson and Superior. Docket No. 57. Those counterclaims include breach of contract (failure to pay rebates, failure to repay personal loans from Thomas and failure to provide future promised business); unjust enrichment (rebates, warranty and service fees); tortious interference with business expectancy (Aspen Links Country Club and Aspen Village Properties); breach of contract (manufacturing defects in modular homes); and fraud and deceit (fraudulent inducement to sign a mortgage in connection with Aspen Village and McKenzie Lane, assignment of mortgage interest in Moose Ridge, fraudulent building practices ). See Docket No. 57 at pp. 7-9. Defendants/counterclaim plaintiffs Western Showcase, Inc. and AMHG, Inc. seek compensatory and punitive damages on their counterclaims, pre- and post-judgment interest, attorney's fees, and other remedies. Id. at 9.

The dates of the business transactions alleged by plaintiffs in their second amended complaint go back as far as April, 2012, and extend into the year 2016. See Docket No. 58.

**B.     Subpoenas Subject To The Motion to Quash**

Counsel for movants/defendants submitted a declaration (Docket No. 90) attaching copies of the subpoenas served by the plaintiffs which are the subject of the motion to quash.  They are as follows:

(1) a subpoena to produce documents, information or objects dated May 17, 2018, served upon Salvatore Torresco, Jr. (Docket 90-4);

(2) a subpoena to produce documents, information or objects dated May 17, 2018, served upon Laura Riffel, individually (Docket 90-5);

(3) a subpoena to produce documents, information or objects dated May 17, 2018, served upon Guardant Investments, Inc., Attn: Laura Riffel. (Docket 90-6).

The subpoenas seek the following information:

- Correspondence, notes, documents, and memorandums, including but not limited to, emails, letters, text messages, checks, deposit slips, receipts, invoices and bank statements, relating to any and all payments and transfers of funds **from Western Showcase Homes, Inc.** (including any of its officers, directors, employees, agents and subsidiaries) **to you** (including any business entities you operate, if any) from January 1, 2012 to the present;

- Correspondence, notes, documents, and memorandums, including but not limited to, emails, letters, text messages, checks, deposit slips, receipts, invoices and bank statements, relating to any and all payments and transfers of funds **from you** (including any business entities you operate under, if any) **to Western Showcase Homes, Inc.** (including any of its officers, directors, employees, agents and subsidiaries) from January 1, 2012 to the present;

Id.  For each of the of the movants (Salvatore Torresco, Laura Riffel individually, and Laura Riffel on behalf of Guardant Investments) the request as it is worded above is also made as to items going to and coming from:

5

American Modular Housing Group, Inc.; American Modular Housing Group, LLC; and Paul Thomas.  Id.

The subpoenas also request the following:

- bank statements, processed checks, deposit slips, and receipts for each and every account into or from which any of the funds involved in the transactions identified [above] were deposited or withdrawn, from January 1, 2012, to present;

- Bank statements, processed checks, deposit slips, and receipts for each and every account with which you (including any business entities you operate under, if any) transacted business with Western Showcase Homes, Inc., American Modular Housing Group, Inc., American Modular Housing Group, LLC, and/or Paul Thomas, from January 1, 2012, to the present.

Counsel for defendants, appearing on behalf of the movants (Salvatore Torresco, Laura Riffel individually, and Laura Riffel on behalf of Guardant Investments) moved to quash these subpoenas on June 4, 2018.  Docket 86.  The movants, through counsel, argue the subpoenas should be quashed because they are duplicative and because they are overbroad and burdensome.

The plaintiffs counter that Mr. Torresco and Ms. Riffel are both business associates of the named defendants—particularly Mr. Thomas—and that Mr. Torresco and Ms. Riffel administered funds and accounts for the defendants.  The plaintiffs further argue the bank records provided by the discovery so far reveal "hundreds of thousands of dollars" worth of unexplained payments to Salvatore Torresco.  The plaintiffs cite the following facts/evidence in support of their argument that the newly issued subpoenas, seeking the

movants' personal financial dealings with the defendants, are necessary to the

discovery process in this lawsuit:

- In May, 2013, Western Showcase wrote seven checks to Salvatore Torresco and one check to Lynn Torresco, totaling $97,788.33. Docket 96, Ex. 6;

- In December, 2013, Western Showcase wrote another seven checks to Salvatore Torresco, totaling $48,450. Docket 96, Ex. 7;

- In June, 2014, Western Showcase wrote twelve checks totaling $373,818.40 to Salvatore Torresco. Docket 96, Ex. 8;

- In March, 2015, Western Showcase wrote eight checks totaling $42,045.06 to Salvatore Torresco. Docket 96, Ex. 9;

- In June, 2016, Western Showcase wrote three checks totaling $25,735.00 to Salvatore Torresco. Docket 96, Ex. 10;

- On January 4, 2013, Laura Riffel transferred $28,726.36 from her own Canadian bank account to Western Showcase. Docket 96, Ex. 3;

- In October, 2012, Laura Riffel transferred over $200,000 from her own Canadian bank account to Western Showcase. Docket 96, Ex. 2;

- In February, 2012, Laura Riffel transferred $68,000 from Guardant Investments to Western Showcase. Docket 96, Ex. 1;

- Defendants' answer to Interrogatory No. 6 states that Guardant Investments "administered an account" for Defendant Western Showcase and American Modular Housing Group. Docket 70-5 at p. 16;

- Evidence already discovered shows defendant Thomas used Western Showcase and AMHG, LLC accounts to cover personal obligations. Docket 64-1 at pp. 3-5; Docket 64-2; Docket 64-9;

- Mr. Torresco's affidavit concedes Mr. Thomas wrote Mr. Torrresco "large checks to pay bills for [Mr. Thomas]." Docket 89, ¶4. Because the checks written *to* Mr. Torresco were from a Western Showcase business account, the plaintiffs assert that the records

7

showing the *outflow* of the money from Mr. Torresco's accounts are also relevant to the claims in this lawsuit.

The plaintiffs further argue that though the objection to the current round of subpoenas is ostensibly filed by Torresco, Riffel and Guardant, ("the movants") it is nothing more than further effort by the collective defendants to obstruct and delay the discovery of clearly relevant information.

## DISCUSSION

**A.      The Scope Of Permissible Discovery**

Federal Rule of Civil Procedure 26(b)(1) sets forth the scope of discovery in civil cases pending in federal court:

> Unless otherwise limited by court order, the scope of discovery is as follows:  Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within the scope of discovery need not be admissible in evidence to be discoverable.

See FED. R. CIV. P. 26(b)(1).  Rule 26 contains specific limitations relative to electronic discovery and other objections to providing discovery:

> (B)     *Specific Limitations on Electronically Stored Information.*  A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost.  On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost.  If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C).  The court may specify the conditions for the discovery.

8

> (C) *When Required.* On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

See FED. R. CIV. P. 26(b)(2)(B) and (C).

The scope of discovery under Rule 26(b) is extremely broad. See 8 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2007, 36-37 (1970) (hereinafter "Wright & Miller"). The reason for the broad scope of discovery is that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." 8 Wright & Miller, § 2007, 39 (quoting Hickman v. Taylor, 329 U.S. 495, 507-08, 67 S. Ct. 385, 392, 91 L. Ed. 2d 451 (1947)). The Federal Rules distinguish between discoverability and admissibility of evidence. FED. R. CIV. P. 26(b)(1), 32, and 33(a)(2) & (c). Therefore, the rules of evidence assume the task of keeping out incompetent, unreliable, or prejudicial evidence at trial. These considerations are not inherent barriers to discovery, however.

"Relevancy is to be broadly construed for discovery issues and is not limited to the precise issues set out in the pleadings. Relevancy ... encompass[es] 'any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.' "

9

E.E.O.C. v. Woodmen of the World Life Ins. Society, 2007 WL 1217919 at *1 (D. Neb. Mar. 15, 2007) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)). The party seeking discovery must make a "threshold showing of relevance before production of information, which does not reasonably bear on the issues in the case, is required." Id. (citing Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1993)). "Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe with a reasonable degree of specificity, the information they hope to obtain and its importance to their case." Id. (citing Cervantes v. Time, Inc., 464 F.2d 986, 994 (8th Cir. 1972)).

Discoverable information itself need not be admissible at trial; rather, the defining question is whether it is within the scope of discovery. See FED. R. CIV. P. 26(b)(1). Additionally, the court may limit the frequency and extent of discovery. See FED. R. CIV. P. 26(b)(2); see also Roberts v. Shawnee Mission Ford, Inc., 352 F.3d 358, 361 (8th Cir. 2003) ("The rule vests the district court with discretion to limit discovery if it determines, inter alia, the burden or expense of the proposed discovery outweighs its likely benefit."); Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Caton, 136 F.R.D. 682, 684-85 (D. Kan. 1991) ("All discovery requests are a burden on the party who must respond thereto. Unless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden.").

## B. Provisions of Rule 45

Rule 45 of the Federal Rules of Civil Procedure allows a party to serve a subpoena for the production of documents on a nonparty, with notice to the other parties in the litigation. See FED. R. CIV. P. 45(a). The nonparty on whom the subpoena is served must be protected from undue burden or expense. Id. at subsection (d)(1).

A subpoena *must* be quashed or modified if it requires the disclosure of privileged or other protected matter if there is no exception or waiver applicable, or if the subpoena subjects a person to undue burden. Id. at subsection (d)(3)(A). A subpoena *may* be quashed or modified to protect a person affected by a subpoena if the subpoena requires disclosure of a trade secret or other confidential research, development, or commercial information. Id. at subsection (d)(3)(B).

"Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought." 9A Wright & Miller, § 2459 (3d ed. April, 2017). As with other discovery, the relevancy issue at the time a subpoena is served is broad—the court does not evaluate whether the evidence sought is admissible, but rather whether the information is relevant to a claim or defense and is nonprivileged. Id. The court also considers whether the information is likely to lead to the discovery of admissible evidence. Id. The party seeking to quash a subpoena bears the burden of demonstrating grounds for quashing it. Id.

11

"When a non-party is subpoenaed, the court is particularly mindful of Rule 45's undue burden and expense cautions." Precourt v. Fairbank Reconstruction Corp. 280 F.R.D. 462, 467 (D.S.D. 2011) (citing Wright & Miller, § 2459 (3d ed. 2008)). If the party seeking the information can easily obtain the same information without burdening the non-party, the court will quash the subpoena. Id. (citing In Re: Cantrell, 2009 WL 1066011 (W.D. Mo. April 21, 2009). Further, if the subpoena seeks the nonparty's confidential information, the court can quash the subpoena and award costs to the non-party. Id. (citing Hawarth v. Herman Miller, Inc., 998 F.2d 975, 978-79 (Fed. Cir. 1993)). Alternatively, Rule 45(c)(3)(A) and (B) allows the court to deny or restrict discovery of documents which may be privileged, confidential, or otherwise privileged. Yellow Robe v. Allender, 2010 WL 1780266 at *6 (D.S.D. Apr. 30, 2010). If the subpoena seeks privileged documents, both Rule 45 and Rule 26 allow the court to seal documents to ensure they will be used only for judicial purposes and will not be disseminated. Id. (citing Schoffstall v. Henderson, 223 F.3d 818, 823 (8th Cir. 2000)).

## C.     Whether the Subpoena Should be Quashed or Modified

As explained above, Mr. Torresco, Ms. Riffel, and Guardant (the movants) assert the subpoenas should be quashed because: (1) they are duplicative to the subpoenas which have already been served in this case; and (2) they are overbroad.

12

### 1. Relevancy

Though the movants do not overtly argue the subpoenas are irrelevant, the court briefly addresses this requirement. As pointed out in the FACTS section of this opinion, *supra*, plaintiffs have made multiple allegations that defendant Thomas has converted monies to his own personal use that were supposed to be routed to plaintiffs. Mr. Thomas is the principal agent and owner of Western Showcase and both AMHG entities.

The movants assert the plaintiffs should be able to determine the merits of their claims from obtaining access to the defendants' corporate financial records, and the records already obtained from the movants in the previous subpoenas which detail the plaintiffs' corporate interactions with the defendants. The movants therefore assert plaintiffs need not delve into the movants' own financial dealings with the defendants.

The plaintiffs counter that they should be allowed to examine not only the defendants' corporate financial records, but also the movants' financial dealings with the defendants. In support of their position, the plaintiffs urge that the corporate records unearthed to date show at least $587,836.79 was transferred from Western Showcase to Salvatore Torresco's personal account. It also appears that Ms. Riffel deposited funds *into* Western Showcase's account, both from the Guardant account and from her own account, during the relevant time frame. Defendants have indicated in their answers to plaintiffs' interrogatories that Ms. Riffel administered an account for defendants Western Showcase and AMHG during the relevant time frame.

Mr. Torresco admits he received large checks into his personal account from Mr. Thomas, and in turn used "cashier's checks from that account" to pay bills for Paul Thomas. See Docket 89.

Among the obvious questions that come to mind are (1) what was the origin of the money Ms. Riffel deposited into Western Showcase's account, i.e. was it money that should have been distributed to plaintiffs under the relevant loan/credit agreements?; (2) why was Mr. Torresco paying Mr. Thomas' bills? and (3) what portion of the money which was deposited into Mr. Torresco's accounts from Western Showcase was for services rendered by Mr. Torresco, and what portion was used to pay Mr. Thomas' bills? (4) of that portion of the money deposited into Mr. Torresco's accounts from Western Showcase that was used to pay Mr. Thomas' bills, what portion of Western Showcase money was used to pay Mr. Thomas' personal bills, and what portion was used to pay the bills of Western Showcase/AMHG entities? These inquiries, among others, are relevant to the issues in this lawsuit.

### 2. Proportionality/Overburdensomeness

The movants assert that because they are non-parties to this action, the information the plaintiffs seek is disproportionate/overburdensome because "plaintiffs now seek to obligate Salvatore, Laura and Guardant to gather documents relating to every transaction between them and the defendants over the past six years. Not only do plaintiffs demand that Salvatore, Laura and Guardant Investments produce all records showing the purpose of each payment, but they also demand production of every bank statement, processed

14

check, deposit slip, and receipt for any account that transferred or received money from the defendants or otherwise did business with defendants over the last six years."

The plaintiffs explain that although a portion of this pending lawsuit has been resolved, there is still a substantial amount of money ($14,000,000.00) at stake. The plaintiffs' service of the subpoenas upon Mr. Torresco, Ms. Riffel and Guardant is, the plaintiffs explain, an effort to determine where exactly the money advanced to Mr. Thomas under the credit agreement went.

The plaintiffs assert the documents they seek via the current subpoenas will assist in either proving or disproving their fraud, conversion, and piercing the corporate veil claims by showing how Mr. Thomas used the money and whether plaintiffs' funds were diverted in the way plaintiffs allege. The subpoenas the plaintiffs have served upon Mr. Torresco, Ms. Riffel, and Guardant, the plaintiffs assert, are therefore proportionate to the needs of the case pursuant to FED. R. CIV. P. 26(b)(1).

The proportionality reference in Rule 26(b)(1) explains that the court should decide whether a discovery request is proportional "considering the importance of the issues at stake in the action, *the amount in controversy*, the parties' relative access to relevant information, the parties' resources, the importance of the information in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit . . . See Rule 26(b)(1) (emphasis added). See also, Yellow Robe, 2010 WL 1780266 at *5 (citing as factors to consider: the relevance of the information, the need of the

15

party for the documents, the breadth of the document request, the time period covered, the particularity with which the requested documents are described, and the burden imposed).

Over fourteen million dollars in damages and ten causes of action remain in plaintiffs' second amended complaint. Though thirteen causes of action and $1,402,407 in damages have been resolved, the defendants and the movants have access to the requested information and the plaintiffs do not. The need for ongoing discovery is not entirely diminished or markedly narrowed. See also, Rasby v. Pillen, 2016 WL 6078312 (D. Neb., Oct. 17, 2016) (plaintiff's requests for business and personal financial records from defendant were relevant and proportional, where plaintiff asserted defendant used company assets for personal benefit and fraudulent misrepresentation). The court concludes the information the plaintiffs seek through the current subpoenas is proportional to the needs of the pending lawsuit.

### 3. Overbreadth

Finally, the movants assert the information the plaintiffs seek through the subject subpoenas are overbroad because (1) plaintiffs seek to learn the purpose for every penny ever paid to or from defendants to the movants and; (2) the plaintiffs seek many categories of documents spanning an extended period of time. The court rejects both of these arguments.

The court has already explained why the information plaintiffs seek is discoverable. The subpoenas were dated May 17, 2018, and requested financial information from January 1, 2012, "to the present." The last time

16

plaintiffs allege they extended credit to the defendants was March 31, 2016. The second amended complaint also alleges, however, that as a result of the defendants' fraud, deceit, and default, over fourteen million dollars remains due and owing to the plaintiffs, with interest continuing to accrue. The complaint also alleges Paul Thomas converted money intended for the plaintiffs to his own use. There is no "end date" on these allegations. The court concludes the information the plaintiffs seek through the subpoenas to the movants is not overbroad.

### 4. The information sought is not duplicative.

The movants assert that because the plaintiffs served subpoenas upon them in August, 2017, which sought information relating to documentation in their possession regarding financial transactions between the plaintiffs and the defendants during the relevant time frame, the plaintiffs have enough---and are therefore not entitled to also obtain information regarding financial transactions between themselves and the defendants during the relevant time frame.

As explained above, however, the information the plaintiffs have discovered to date reveals the movants have information which is relevant to the plaintiffs' claims. This is so because the plaintiffs allege they loaned defendants over fourteen million dollars, which they allege defendants used for improper purposes and then failed to repay. The documentation discovered through the first round of subpoenas indicates the defendants paid Mr. Torresco over several hundred thousand dollars during the relevant time

17

frame. The defendants may assert this money was paid to Mr. Torresco for purposes properly envisioned by the loan and credit agreements, but that is not readily apparent absent the documentation the plaintiffs seek from Mr. Torresco through the currently disputed subpoenas. The same holds true for the documentation the plaintiffs currently seek from Ms. Riffel and Guardant Investments.

**D.    Protective Order**

Some of the documents the plaintiffs seek to discover through the disputed subpoenas are likely to be "confidential" as that term is contemplated under the protective order entered by the court dated March 6, 2018. Confidential documents produced as a result of the disputed subpoenas should be protected from unfettered public dissemination.

The movants and the parties are directed to ¶ 5 of the March 6, 2018, protective order for the procedure to determine which documents produced pursuant to the disputed subpoenas shall be designated as "confidential" pursuant to the protective order.

**E.    Plaintiffs' Motion for Attorney's Fees**

In their resistance to the movants' motion to quash, the plaintiffs requested the court to award them their attorney's fees *against the defendants* in the event the plaintiffs prevailed in their position that they are entitled to discover the documents requested by the disputed subpoenas. In support of their request for fees, the plaintiffs argue that this court has already determined similar documents were relevant and discoverable.

18

As the plaintiffs aptly noted in their opposing brief, however, the earlier subpoenas—and this court's earlier ruling—pertained to documents that were relevant because they contained information about transactions by or between the parties to this lawsuit. The currently disputed subpoenas seek documents that are in the possession of the movants (as were some of those subject to the first subpoenas), but are different documents altogether, as they seek information about transactions that are one step removed from those directly between the parties. And while these newly requested documents are relevant for some of the same *reasons* as the previously subpoenaed documents, their relevance is more attenuated than those requested by the previous subpoenas.

More importantly, the plaintiffs have cited no authority that would allow the court to award sanctions against the defendants for a motion filed by movants--who are not parties to this lawsuit. Though the movants are represented by the same lawyer as the defendants, the defendants did not move to quash the subpoenas—the movants did. The court will not sanction the defendants for a motion filed by someone else.

For all of these reasons, the court will not award the plaintiffs' attorney's fees against the defendants.

## CONCLUSION

It is hereby

ORDERED that movants' motion to quash [Docket No. 86] is DENIED, with the caveat that the information provided to the plaintiffs as a result of the

disputed subpoenas may be subject to the protective order entered by the court on March 6, 2018.

DATED this 11th day of December, 2018.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge