UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LARSON MANUFACTURING COMPANY OF SOUTH DAKOTA, INC., SUPERIOR HOMES, LLC, | 4:16-CV-04118-VLD |
| Plaintiffs, | |
| | MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO AMEND SCHEDULING ORDER AND TO JOIN PARTIES, DOCKET NO. 109 |
| vs. | |
| WESTERN SHOWCASE HOMES, INC., AMERICAN MODULAR HOUSING GROUP, LLC, AMERICAN MODULAR HOUSING GROUP, INC., PAUL THOMAS, | |
| Defendants. | |

## INTRODUCTION

This matter is before the court on the basis of diversity jurisdiction, 28 U.S.C. § 1332, after defendants removed the matter from South Dakota state court. The parties have consented to this magistrate judge handling their case pursuant to 28 U.S.C. § 636(c).

Plaintiff Larson Manufacturing Company of South Dakota, Inc. (Larson) is the parent company of plaintiff Superior Homes, LLC (Superior). Superior is in the business of manufacturing and selling modular homes.

Defendant Western Showcase Homes, Inc. (Western) in the business of purchasing, reselling, and financing modular homes. Defendant Paul Thomas is the sole member of Defendant American Modular Housing Group, LLC (AMHG, LLC), a company in the business of buying and reselling modular

homes. Defendant American Modular Housing Group, Inc. (AMHG, Inc.), is a corporation that also buys and resells modular homes. Thomas is the principal agent and owner of both AMHG entities.

The defendant entities purchased modular homes from Superior and then re-sold those homes to customers, sometimes arranging for delivery, set and completion of the home at the customer's location. Larson and Superior extended credit to the defendant entities for these purchases; AMHG would then repay the loans when its customer paid the defendant entities.

The second amended complaint recites that defendant entities placed orders for fourteen modular homes with plaintiffs. Plaintiffs constructed the homes. Of the homes that were delivered to defendants, full payment was never made even though the complaint alleges the ultimate customers who received these homes paid defendants. Other modular homes ordered by defendants were custom-built and never delivered because defendants never paid for the homes. As to the homes plaintiffs retain possession of, plaintiffs allege the custom nature of the homes makes resale of the homes at a reasonable value impracticable.

In addition, Larson entered into a loan agreement with Western which was guaranteed by AMHG, Inc. This loan agreement ultimately encompassed $14 million in funds. Larson alleges Western defaulted on the loan and AMHG, Inc. refused to pay pursuant to its guarantee. For all these matters, plaintiffs assert three counts of breach of contract, two counts of fraud, two counts of conversion, one count each of debt and guarantee, and one count of piercing

the corporate veil.[1]  Plaintiffs also allege defendant Thomas converted money which was received from third parties and intended for plaintiffs, but was instead used by Mr. Thomas for his own personal use.

In their answer to the second amended complaint, defendants generally deny nearly all of plaintiffs' allegations.  Defendants Western Showcase, Inc., and American Modular Housing Group, Inc., assert five counterclaims against Larson and Superior.  Those counterclaims include breach of contract (failure to pay rebates, failure to repay personal loans from Thomas and failure to provide future promised business); unjust enrichment (rebates, warranty and service fees); tortious interference with business expectancy (Aspen Links Country Club and Aspen Village Properties); breach of contract (manufacturing defects in modular homes); and fraud and deceit (fraudulent inducement to sign a mortgage in connection with Aspen Village and McKenzie Lane, assignment of mortgage interest in Moose Ridge, fraudulent building practices).

---

[1] The plaintiffs' first amended complaint contained several additional claims. See Docket 1-6.  During the course of this litigation in federal court, however, the parties reached a settlement agreement regarding several of the claims contained within the first amended complaint and the defendants' counterclaims against the plaintiffs which were associated with those settled claims.  As a result of the settlement agreement, the parties agreed to dismiss the affected claims/counterclaims in this lawsuit.  Plaintiffs eventually moved to compel enforcement of the settlement agreement (Docket 31), and the court granted that motion.  Docket 50.  Thereafter, the plaintiffs filed their second amended complaint, which appears to have deleted the claims which are the subject of the settlement agreement.  Docket 58.  Likewise, the defendants filed their amended counterclaim, which appears to have deleted the counterclaims which are the subject of the settlement agreement. Docket 57.

Defendants/counterclaim plaintiffs Western Showcase, Inc. and AMHG, Inc. seek compensatory and punitive damages on their counterclaims, pre-and post-judgment interest, attorney's fees, and other remedies.

Now pending is the defendants' motion to amend the scheduling order and to join necessary, or in the alternative, permissive, parties (Docket No. 109). The plaintiffs oppose the motion (Docket No. 115).

**FACTS**

An abbreviated version of the facts is recounted here, consisting mostly of the procedural history pertinent to the defendants' motion to join the Aspen entities as parties.

This lawsuit began in state court. The defendants removed it to federal court, after which they requested and received an extension of time to file their answer. The defendants' answer asserted several counterclaims against the plaintiffs.

Approximately three months after filing their answer to the plaintiffs' complaint, the defendants filed a motion for leave to file a third-party complaint (Docket 13). That motion sought to assert third-party claims against William Retterath, Greg Jahnke, Ryland Waugh, Aspen Village Properties, Mauri Gwynn Developments, and Waugh Who Developments. Id. The plaintiffs resisted the motion because it did not seek contribution or indemnity. See Docket 15. This court agreed, and on March 8, 2017, denied the defendants' motion for leave to file a third-party complaint.

On July 11, 2017, the Western entities initiated a separate lawsuit against Larson, William Retterath, Greg Jahnke, Rylan Waugh, Aspen Village Properties, Mauri Gwyn Development, and Waugh Who Developments. See Civ. No. 17-4091, United States District Court, District of South Dakota, Southern Div., Docket No. 1. In that separate lawsuit, the Western entities asserted Greg Jahnke was the principal of both Aspen and Mauri Gwyn. Western further alleged it had a contractual relationship with Aspen/Mauri Gwyn over a period of years for the sale and development of modular homes, and that Aspen/Mauri Gwyn breached its contract with Western. Id. Docket 1. Specifically, Western alleged Aspen/Mauri Gwyn failed to properly remit payments to Western. Western alleged Aspen/Mauri Gwyn (1) failed to remit a share of profits to Western as agreed by contract; (2) failed to remit rebates; (3) failed to remit administration fees; (4) failed to remit other agreed upon payments to Western; and (5) failed to pay development costs such as taxes, insurance, bonds, and commissions; (6) authorized changes and modifications not contemplated by the contract; and (7) failed to adequately fulfill its duties of contractor of record for the work in question.

The defendants in that separate lawsuit moved to dismiss, arguing some claims in the separate lawsuit were duplicative of the counterclaims in this pending lawsuit and that the non-duplicative claims were not adequately pled. See defendants' motion to dismiss, Civ. No. 17-4091, Docket No. 6.

On August 10, 2017, the district court *sua sponte* ordered the parties to brief whether the court had jurisdiction to determine the claims within the

separate lawsuit that were made against the Canadian defendants.  Id., Docket No. 13.  On September 25, 2017, the Western entities, by then represented by their current counsel, voluntarily dismissed the separate lawsuit without prejudice.  See Civ. No. 17-4091, Docket No. 16 & 17.

## DISCUSSION

Defendants move to amend the scheduling order and to join a necessary or alternatively a permissive party.  The defendants wish to add the Aspen entities—one of the Canadian defendants the plaintiffs were previously unsuccessful in bringing into this lawsuit as a third-party defendant and which was a named defendant in the separate lawsuit the defendants previously voluntarily dismissed without prejudice.

The defendants assert joinder of the Aspen entities is necessary to a full and fair adjudication of this lawsuit under FED. R. CIV. P. 19 because (1) complete relief cannot be afforded among the existing parties in their absence; (2) the Aspen entities claim interests in this action that will be impaired or impeded if they are not joined; (3) the parties may incur multiple or otherwise inconsistent obligations if the Aspen entities are not joined.

Alternatively, the defendants ask the court to join the Aspen Entities as a permissive party under FED. R. CIV. P. 20.  In support of this argument, the defendants assert the Aspen entities may be jointly or severally liable for the claims the plaintiffs have asserted against Western, and because there are numerous questions of law and fact common to all parties.

**A.      Rule 16(b) and the Modification of the Scheduling Order**

Pursuant to FED. R. CIV. P. 16, the court's scheduling order must limit the time to join other parties, amend the pleadings, complete discovery, and file motions.  See FED. R. CIV. P. 16(a)(3)(A).  Motions to amend a scheduling order are governed by FED. R. CIV. P. 16(b)(4).  That rule provides in relevant part:

> **(4)      *Modifying a Schedule.*** A schedule may be modified only for good cause and with the judge's consent.

A federal court may modify a scheduling order where the moving party has been diligent and the non-moving party will not be prejudiced.  Sherman v. Winco Fireworks, 532 F.3d 709, 717 (8th Cir. 2008).  When the original date set by the court has already passed, the party requesting the modification must show good cause.  IBEW Local 98 Pension Fund v. Best Buy Co., Inc., 2018 WL 337715 at * 7 (D. Minn. July 11, 2018).  And the primary measure of good cause under Rule 16(b) is the moving party's diligence in attempting to meet the order's requirements.  Id.

While prejudice to the non-moving party remains relevant to the inquiry, generally the court will need not even consider prejudice if the moving party has not been diligent.  Id.  (citing Bradford v. DANA Corp., 249 F.3d 807, 809 (8th Cir. 2001)) (reasoning that under Rule 16(b), when the moving party has not shown diligence, the analysis need not proceed to, or consider the non-movant's prejudice).  And finally, "[A] party does not meet the good cause standard under Rule 16(b) if the relevant information on which it based the amended claim was available to it earlier in the litigation."  Id. (citing Parker v. Columbia Pictures Industries, 204 F.3d 326, 340-41 (2d. Cir. 2000)).

### 1.    Good Cause.

The court entered a scheduling order in this matter (Docket 12) setting January 31, 2017, as the deadline for joining additional parties.  The first relevant inquiry is whether the defendants should be allowed to modify the scheduling order to add a new party—several months after that deadline has expired, and after the court has already once denied the defendants' motion to add this same party.

The defendants assert good cause exists to modify the scheduling order to add the Aspen entities, and that they have been diligent.  In support of this argument, the defendants cite "the benefit of additional discovery and production of documents, some of which have been produced within the last few months, and which affirmatively demonstrate the Aspen entities' wrongdoing."  Docket 110, p. 6.

In support of their position, the defendants cite documents (Docket Nos. 107-35, 43, 44, 45, 46, 48, 50, 80, 85, 111, 112, 113) which appear to show how the Aspen entities have appraised certain of the Aspen properties, how money has been withdrawn and paid to the credit line from Larson, and how monies collected from the sale of the Aspen condos was disbursed by Aspen's law firm (McKercher).  The defendants assert these documents, recently produced in the discovery portion of this lawsuit, show that Aspen has acted wrongfully in all of these areas, to the defendants' detriment.

But other documents produced in this lawsuit indicate all this information is not new to the defendants.  In a July 27, 2015, email from

Mr. Thomas to Mr. Retterath,[2] Mr. Thomas explained the appraisals and accounting information were in his (Thomas's) possession and that he (Thomas) had shared that information with Mr. Jahnke. The email string indicates Mr. Thomas or his associate, Sal Torresco, had all of this information and had forwarded it to the Aspen entity's principal, Mr. Jahnke. Mr. Thomas further explained:

> [A]all deals funded to date and any or all purchase contracts were signed by Jahnke and Aspen Village with partial release of Mortgage documents sent to Larson. All deals funded to date including land and any homes/condos were signed by Jahnke and handled by the McKercher Law Firm. They would have all those records as they were the entity that produced those closing documents and distributed all the funds. They call those documents SOA (Statement of Adjustments). Any questions give me a call. Regards, Paul.

See email dated July 27, 2015, from Paul Thomas to Bill Retterath, Docket No. 107-47. This communication between Mr. Thomas and Mr. Retterath indicates Mr. Thomas knew of the information contained in the appraisals and the manner in which the McKercher Law Firm distributed the funds generated by the sale of the Aspen Village condos long before discovery was exchanged in this lawsuit.

The court is not persuaded that any of discovery produced in this lawsuit tips the scale in the defendants' favor on the issue of diligence. Nevertheless,

---

[2] It appears this email was exchanged during the time frame when the parties were trying to persuade Mr. Jahnke/Aspen to sign the 3rd amended credit agreement. See also, Docket 107-103 (email string from July, 2015, between Retterath, Thomas, et. al. regarding their attempts to persuade Jahnke to sign the third amended credit agreement and acknowledging one of the reasons for Jahnke's refusal to sign was "all the documents we provided Greg and Aspen did not add up to the amount of the 17.5 that Bill had on the mortgage.").

the defendants did first try to add the Aspen entities as parties to this dispute before the expiration of the deadline for adding parties. That the court denied their motion at that time does not detract from the diligence of the defendants' efforts. The court therefore turns to whether adding the Aspen entities at this time would cause prejudice to the plaintiffs.

## 2. Prejudice to Plaintiffs.

The prejudice to the non-moving party in the context of a Rule 16 motion to amend includes both timing and logistical considerations. Specifically, the court must consider whether the modification of the scheduling order would significantly delay the proceedings or expand the scope of the issues in the lawsuit. Vails v. United Community Health Center, Inc., 283 F.R.D. 512, 514 (N.D. Iowa 2012) (court found prejudice would result if motion to amend scheduling order was granted because discovery, and ultimately trial dates would need to be extended).

In this case, the defendants indicate their amendment will cause neither problem, while the plaintiffs assert the proposed amendment will cause both problems. The defendants assert plaintiffs will not be prejudiced if the Aspen entities are added as parties to this lawsuit because discovery is in its infancy, and the parties have yet to complete expert discovery. They further assert that depositions have not been taken,[3] three months remain to complete fact discovery, and trial is nine months away. Further, the defendants argue, the

---

[3] Since briefing on this motion, the parties have taken some depositions. See Docket Nos. 134-1 and 134-2.

discovery necessitated by adding the Aspen entities will be required even if the Aspen entities are not made parties to the lawsuit. The defendants assert adding the Aspen entities will benefit rather than prejudice the plaintiffs.

The plaintiffs, however, disagree. They assert that adding the Aspen entities to this lawsuit will cause them prejudice. The plaintiffs do not want the Aspen entities added to what the plaintiffs characterize as a simple contractual claim between the plaintiffs and the defendants. The plaintiffs allege that adding the Aspen entities would expand the scope of the issues, facts, and parties to the suit. They also assert it would delay the course of this already extended litigation, because, the plaintiffs predict, the Aspen entities will most certainly make a motion to dismiss. In the event the motion to dismiss is unsuccessful, then (according to plaintiffs) even more discovery will need to occur, which will cause even more delay.

The current scheduling order sets the date for concluding fact and expert discovery at March 1, 2019. The motion deadline is April 1, 2019, and trial is set for August 20, 2019. This case has now been pending for well over two years.

The court agrees it is inevitable that should the defendants' motion be granted, delay will occur. This is because (among other reasons) there is a significant issue regarding the court's jurisdiction over the Canadian Aspen entities which would inevitably be raised, requiring a briefing period by the parties and a temporary suspension of the proceedings in the interim.

Even if the court did have jurisdiction over the Aspen entities, the time for discovery would need to be extended. Though the defendants assert discovery is still in its "infancy," this is not entirely accurate. The current parties have already exchanged several sets of written discovery requests requiring this court to resolve multiple discovery disputes.

This proposed new party would likewise be entitled to make written discovery requests of the current parties and vice versa, and the court has little hope that those requests would be met with any less contention than those exchanged thus far. That only a few depositions have been taken, therefore, does not persuade the court that adding a new party will not delay the progress of discovery this case. Extra discovery and the attendant delay constitutes the prejudice contemplated Rule 16(b) which authorizes the court to exercise its discretion withhold consent to modify the scheduling order. The court finds the plaintiffs would be prejudiced by the necessity of extra discovery and the attendant delay if the defendants' motion to amend the scheduling order is granted in this instance.

The court finds the defendants have not shown good cause to amend the scheduling order to allow addition of new parties at this time—some eighteen months after the deadline for doing so has passed. Additionally, amending the scheduling order to allow the addition of new parties now, when the lawsuit had been pending for over two years, would necessitate adding new issues to the lawsuit which in turn would necessitate additional discovery and cause undue delay. The motion to amend is therefore DENIED.

**B.     Rule 19 Joinder of Necessary Parties[4]**

Out of an abundance of caution, the court addresses the defendants'

argument that the scheduling order should be amended to add Aspen as a

party because the Aspen entities are necessary parties to this lawsuit.

FED. R. CIV. P. 19(a)(1) provides:

**(a) Persons Required to Be Joined if Feasible.**
  **(1). *Required Party.*** A person who is subject to service of
  process and whose joinder will not deprive the court of
  subject-matter jurisdiction must be joined as a party if:
   (A)     in that person's absence, the court cannot
      accord complete relief among existing parties;
   (B)     that person claims an interest[5] relating to the
      subject of the action and is so situated that
      disposing of the action in the person's absence
      may;
      (i) as a practical matter impair or impede the
      person's ability to protect the interest; or
      (ii) leave an existing party subject to a
      substantial risk of incurring double, multiple, or
      otherwise inconsistent obligations because of the
      interest.

---

[4] The plaintiffs aptly note defendants have not clearly explained in their motion
or brief in what capacity they propose to join the Aspen entities.  No proposed
pleading was included to clarify this issue.  The defendants' previous attempt
to join Greg Jahnke and Aspen Village Properties as third-party defendants was
unsuccessful because the defendants did not seek to bring claims against
Jahnke or Aspen that were based upon the theories of contribution or
indemnity.  See Docket 22.  It is unclear whether the defendants' proposal to
join the Aspen entities at this time would cure this deficiency.

[5] The court notes that Aspen has never affirmatively claimed an interest in this
lawsuit.  Instead, it has always been *Western* who has tried to bring Aspen into
this forum.  See Spine Imaging MRI, L.L.C. v. Liberty Mutual Insurance Co.,
2010 WL 11537461 (D. Minn. Dec. 23, 2010)(citing American Ins. Co. v. St.
Jude Medical, Inc., 597 F. Supp. 2d 973, 978 (D. Minn. 2009) ("the plain
language of Rule 19(a)(1)(B) requires that a person not only have an interest to
the subject of the action, but that person must affirmatively "claim an
interest").

<u>See</u> Fed. R. Civ. P. 19(a).  If the proposed party meets the definition of a required party under Rule 19(a) and would not deprive the court of jurisdiction, the party must be joined.  <u>Baker Grp. L.C. v. Burlington N. & Santa Fe Ry. Co.</u>, 451 F.3d 484, 490 (8th Cir. 2006).  If joinder is not feasible but the party meets the criteria of Rule 19(a), the court proceeds to Rule 19(b) to decide whether the action should be dismissed or continued in the proposed party's absence.

7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1604, (3d ed. 1983).[6]

### 1.    Whether Joinder of Aspen Is Feasible

"It is by now well settled that the party seeking to invoke the jurisdiction of a federal court has the burden of establishing that jurisdiction exists, and the burden may not be shifted to the party challenging the jurisdiction." <u>Mountaire Foods, Inc. v. Agro Impex</u>, S.A. 677 F.2d 651, 653, n.3 (8th Cir. 1982); <u>Cafesjian v. Armenian Assembly of America, Inc.</u>, 2008 WL 906194 at *10-11 (D. Minn. Mar. 31, 2008) (imposing burden of proof upon movant who wished to add a necessary party under Rule 19(a)).

Here, plaintiffs assert joinder of Aspen is not feasible because as Canadian citizens, the Aspen entities are not subject to the personal jurisdiction of the court.  The movants (defendants) assert this court's exercise of personal jurisdiction over Aspen would satisfy due process requirements because South Dakota's long-arm statute confers jurisdiction to the full limits

---

[6] Here, neither party suggests the action should be dismissed if the court does not grant the defendants' motion to amend the scheduling order to allow the addition of necessary/permissive party Aspen entities.

of the Due Process clause, citing J & J Ventures Corp. v. S.C.S. of Kansas City, Inc., 250 F.R.D. 441, 443 (D.S.D. 2008).

Due process allows a court to exercise personal jurisdiction over a non-resident defendant only if doing so is consistent with traditional notions of fair play and substantial justice. International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945), and if the defendant has sufficient "minimum contacts" with the forum state, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980). The contacts with the forum state are sufficient if the non-resident defendant "should reasonably anticipate being haled into court there," World-Wide Volkswagen Corp., 444 U.S. at 297, because it has performed " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.' " Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). The inquiry is whether the non-resident defendant "has 'purposefully directed' his activities at residents of the forum . . . and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King, 471 U.S. at 472 (additional citations omitted).

The Eighth Circuit has set forth five factors for consideration of whether a defendant has sufficient minimum contacts with the forum state such that the state's assertion of jurisdiction over the defendant comports with due process. To determine personal jurisdiction, the Court should consider (1) the nature and quality of the contacts, (2) the quantity of the contacts, (3) the

relationship of the cause of action to the contacts,[7] (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience or inconvenience to the parties.

The first three factors are of primary importance. <u>Burlington Industries, Inc. v. Maple Industries, Inc.</u>, 97 F.3d 1100, 1102 (8th Cir. 1996). In determining whether sufficient minimum contacts exist, the court should consider all the defendant's contacts in the aggregate and the totality of the circumstances. <u>Northrup King. Co. v. Compania Productora Semillas Algodoneras, S.A.</u>, 51 F.3d 1383, 1388 (8th Cir. 1995).

The defendants do not dispute the Aspen entities are Canadian corporations with their principal place of business in Canada. Further, the Aspen entities are not parties to the contract which forms the center of the dispute in this lawsuit—the Third Amended Credit Agreement. Aspen specifically refused to execute that agreement.

Instead, the defendants assert the Aspen entities' liability in this matter hinges on their failure to abide by the terms of a contract executed in Canada between Western and Aspen (the Modular Home Sales Agreement—Docket 107-22). The plaintiffs are not parties to that agreement. Additionally, the Modular Home Sales Agreement contains a choice of law clause (§ 10.01) indicating the

_____

[7] The third factor distinguishes whether the jurisdiction is specific or general. <u>See</u> <u>Digi-Tel Holdings, Inc. v. Proteq Telecomms., Ltd.</u>, 89 F.3d 519, 522 n.4 (8th Cir. 1986). "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant regardless of where the cause of action arose." <u>Id.</u>

parties agree Saskatchewan law applies.  Id. at p. 14.  In that same section

(§ 10.01) the parties consented to the "exclusive jurisdiction and venue of the

courts of the Province of Saskatchewan with respect to any controversy arising

out of this Agreement or the transactions contemplated hereby."  Id.

Despite the choice of law and forum selection clause contained within the

Modular Home Sales Agreement, the defendants assert the following actions on

the part of the Aspen entities constitute sufficient minimum contacts with the

state of South Dakota to put Aspen on notice that it should have reasonably

anticipated being haled into court here:

- Aspen entered into a commercial relationship with plaintiffs as early as 2011, when they envisioned an ongoing arrangement in which Aspen would purchase dozens of modular homes for the Aspen project from Superior.  To that end, in December, 2011, Aspen executed loan agreements with Larson, a South Dakota corporation, in the amount of $5 million.  Larson's loan to Aspen was secured by a promissory note, collateral mortgage, assignment of leases and rents, and a personal guarantee from Greg Jahnke.

- In April, 2012, Western assumed Aspen's debt to Larson.  The term note related to Aspen's debt on the Aspen Village lands, but these funds were also used to, among other things, pay Superior, a South Dakota corporation, for the two homes it had manufactured in South Dakota for Aspen.  In exchange for Western's debt assumption, Aspen agreed its prior collateral mortgage and assignment of leases and rents would continue to secure all amounts and obligations Western assumed or owed Larson under the Credit Agreement.  Aspen agreed that, through the Credit Agreement, Larson, a South Dakota corporation, would continue to hold mortgage interests on properties Aspen owned to secure Western's debt to Larson.

- The Credit Agreement between Western and Larson contained a South Dakota forum selection clause.  Aspen is not a party to the Credit Agreement or the series of amendments to the Credit Agreement.  Aspen, however, understood that Larson would continue to hold mortgage interests on properties Aspen owned to secure Western's debt to Larson.  The Aspen entities' execution of the collateral mortgage, assignment of

leases and rents, and related documents were listed as "conditions" in the Credit Agreement and amendments to the Credit Agreement.[8]

- The defendants assert, therefore, that the Credit Agreement contemplated an ongoing and significant commercial relationship among plaintiffs, the Western entities, and Aspen. Also, Greg Jahnke traveled to South Dakota to visit the Superior manufacturing facility on multiple occasions. In support of this assertion, the defendants cite the affidavit of Paul Thomas, Docket 118, ¶ 3. That document does not cite any specific dates that Mr. Jahnke visited the Superior manufacturing facility.

The court is not persuaded it is feasible to add Aspen as a party at this time. Though Aspen initially entered into a commercial relationship with Larson in 2011 and executed a promissory note, collateral mortgage, and assignment of leases and rents in connection with that relationship, Western assumed Aspen's obligations to Larson in early 2012. From that point forward, the Credit Agreement was between Larson and Western—not Larson and Aspen.

That Aspen may have agreed to mortgage portions of its real property located in Canada to secure Western's (a citizen of Nevada) debt to Larson does not clearly indicate to this court that Aspen anticipated it might be haled into court in South Dakota. The agreement between Aspen and Western (the Modular Home Sales Agreement) contains a forum selection clause indicating any disputes between those two parties will be resolved in Canada—further persuading this court that joinder of Aspen is not feasible in this forum. Western's final argument—that Aspen's principal (Greg Jahnke) traveled to Superior's manufacturing plant—is equally unavailing because Western is not

---

[8] The parties disagree about whether Aspen's execution of these documents was a condition precedent to the plaintiffs' ability to enforce the Credit Agreement.

specific as to the timing of those trips. The court understands Western's explanation that it was Aspen who first initiated the relationship with Larson/Superior when Aspen contracted with Larson/Superior to build modular homes for the Aspen project in 2011. But as of early 2012, Western assumed Aspen's obligations to Larson/Superior. There is no indication in this record that Mr. Jahnke visited South Dakota after that date.

The defendants wish to invoke the court's jurisdiction to add the Aspen entities as a party to this lawsuit. But defendants have not borne their burden to show the court would have personal jurisdiction over the Aspen entities. Mountaire Foods 677 F.2d at 653, n.3; Cafesjian, 2008 WL 906194 at * 10-11.

**2. Whether Complete Relief Among the Existing Parties Is Possible In The Absence Of The Aspen Entities under FED. R. CIV. P. 19(a)(1)(A).**

Even if it were feasible to add Aspen as a party, the court does not find Aspen to be a necessary party under Rule 19. The first factor to consider under Rule 19 is whether complete relief is possible among the existing parties in the absence of the Aspen entities. See FED. R. CIV. P. 19(a)(1)(A). Persons with conflicting claims to a particular fund are indispensable parties to its disposition. Cass Clay, Inc. v. Northwestern Public Service Company, 63 F.R.D. 34, 37 (D.S.D. 1974). But the proper focus of the Rule 19(a)(1) inquiry is the possibility of "relief between the existing parties, and not on the speculative possibility of further litigation between a party and an absent person." LLC Corporation v. Pension Benefit Guaranty Corporation, 703 F.2d 301, 305 (8th Cir. 1983) (citing Morgan Guaranty Trust Co. v. Martin, 466 F.2d

19

593, 598-99 (7th Cir. 1972). With regard to this basis for joinder, the court must consider whether "meaningful relief" is available to the plaintiff. Guggenberger v. Minnesota, 198 F. Supp. 3d. 973, 1034 (D. Minn. July 28, 2016) (citing Henne v. Wright, 904 F.2d 1208, 1212 n. 4 (8th Cir. 1990)). Further, third parties are "not necessarily required parties under Rule 19 merely because they are involved in conduct underlying a plaintiff's claims." Id. (citing EEOC v. Cummins Power Co., 313 F.R.D. 93, 99-101 (D. Minn. 2015). If the defendant is independently liable for the plaintiff's claims, complete relief is available in the absence of such third parties. Guggenberger, 198 F. Supp. 3d at 1034.

Here, Western asserts the Aspen entities must be joined in this lawsuit because they claim entitlement to a common fund. That common fund is the proceeds from the sales of the modular homes which are the subject of the Modular Homes Sales Agreement. Western also asserts that because Larson holds a mortgage on some of the modular homes and upon some undeveloped property that is owned by Aspen, "as to every sale of a modular home or mortgaged property, a dispute exists among plaintiffs, the Western entities, and Aspen entities regarding who is entitled to that money; whether the Aspen entities should receive the money for the sale of the property it owns; whether the Western entities should receive the money to which it is entitled under the Modular Home Sales agreement; or whether plaintiffs should receive the money to satisfy all or a portion of Western's debt to Larson." Docket 119 at p. 11.

But plaintiffs counter that whether the money is appropriately divided between Aspen and Western pursuant to the Modular Home Sales Agreement when a modular home is sold is of no importance as it pertains to the plaintiffs or to this lawsuit, because the plaintiffs are not parties to the Modular Home Sales Agreement. The plaintiffs bluntly state that they don't care where the money comes from, they just want the money that Western owes them pursuant to the Third Amended Credit Agreement.

The plaintiffs explain "Larson certainly hopes and expects Western will pay Larson the proceeds Western receives from Aspen under [the Modular Home Sales Agreement], but that does not transform those proceeds into a 'common fund.' A party cannot defend a collection action by claiming some third party failed to pay it the money needed to satisfy its debt to the plaintiff." See Docket 115, p. 9.

In their reply brief (Docket 119) the Western entities assert plaintiffs are over-simplifying matters because it was Aspen who divvied up the money upon the sale of the modular homes. Western further claims it was Aspen who misdirected or misappropriated the money that was supposed to be used to pay down the debt to Larson pursuant to the terms of the Third Amended Credit Agreement. This, Western contends, satisfies the common fund requirement because "[t]hus, because [Aspen] may ultimately be responsible for any alleged conversion of funds, [Aspen]—not the Western entities—may have the money that plaintiffs want." See Western's reply brief, Docket 119, at p. 12.

The court returns to selected language from both the Third Amended Credit Agreement and the Modular Home Sales Agreement. The Third Amended Credit Agreement was entered into between Western and Larson in May, 2015. In § 4.2, the Third Amended Credit Agreement provides in part:

> The borrower shall use its best commercial efforts to complete and market the properties that are mortgaged to the lender for the obligations of the borrower to the lender. The borrower shall pay **all net sales proceeds** for any disposition of such properties to the lender until all obligations to the lender have been fulfilled. Net sales proceeds shall me (sic) the total sales proceeds less reasonable adjustments and selling costs (including but not limited to legal fees in respect to such sale). **Notwithstanding the foregoing and regardless of whether there are sufficient sales to achieve the payments referred to below, all amounts owing by the borrower to the lender as set forth above** and any additional amounts owing by the borrower for matters occurring and additional advances made, if any, after March 21, 2015, including for greater certainty, all principal, interests, costs, and other amounts due and payable by the borrower to the lender, **are due and payable by minimum payments as follows:**
>
> > (a) $660,000 USD on or before June 30, 2015
> > (b) $2,640,000 USD on or before September 1, 2015
> > (c) $Not less than one-half of the outstanding balance of principal and interest on or before December 15, 2015
> > (d) All remaining amounts on or before March 31, 2016.

See Docket 107-95, p. 3. The only signatories to the third amended credit agreement are Larson and Western/AMHG.

The only signatories to the Modular Home Sales Agreement (Docket 107-22) are Aspen and Western. The Modular Home Sales Agreement, in which Western is the seller and Aspen the buyer, was entered into between the parties in February, 2012, and provides in part:

> § 2.02 (e)    Within ten (10) days after Buyer's sale of each Home to a Customer, Buyer shall pay to Seller thirty-five percent (35%) of

the Net Profit (as hereinafter defined) realized by Buyer upon the resale of the Home.

§ 2.10 <u>Net Profit.</u> For purposes of subsection 2.02(d) (sic) hereof, "Net profit" shall mean the difference of (a) the purchase price paid by a Customer for a Home together with the real property of which the Home has been affixed to and made a part of and any personal property sold in conjunction with the Home; and (b) the sum of: (x) an amount equal to the sum of subsections 2.02 (a)-(d)[9] hereof; (y) the actual costs of the real property on which the Home has been affixed; and (z) the Interest (as hereinafter defined) on the outstanding principal amount of the Loan (as hereinafter defined). In determining "Net Profit" hereunder, no allowance or consideration shall be given to any actual costs of Buyer in affixing the Home to the Project or any actual costs of Buyer in reselling the Home, including without limitation compensation or commissions paid to any of Buyer's owners, officers, directors, employees, independent contractors, agents, or any broker or finders fees. In determining "Net Profit" hereunder, no allowance or consideration shall be given or made to any overhead, administrative or employee, agent, or independent contractor costs or any other business expenses of the Buyer of any kind whatsoever, whether paid to third parties or otherwise.

<u>See</u> Docket 107-22.

Western asserts it cannot pay the amount owed to Larson under the Third Amended Credit Agreement because Aspen misappropriated the funds from the sales of the modular homes, so that Western never got the 35% net profit it was due under the Modular Home Sales Agreement. It was this 35% profit—Western argues--that Western would have used to pay Larson, so

---

[9] These items included the manufacturer's price of the home, the actual cost of transportation of the home, and the actual or contracted costs incurred in affixing the home to the real property of which the home will become a part including installation costs, improvements to the real property, and other incidental costs necessary to cause the Home to be ready for occupancy. <u>See</u> Docket 107-22, § 2.02(a)-(d).

Larson should be looking to Aspen for payment because Aspen wrongfully has Larson's money, not Western--or so Western's argument goes.

Western's argument, however, ignores the plain language of § 4.2 of the Third Amended Credit Agreement. Section 4.2 refers to Western's obligation to pay the amounts Western owes Larson from the net sale proceeds of the subject properties. Because Western is the only signatory to the agreement who is indebted to Larson, the "net proceeds" are the net proceeds *to Western* (i.e. Western's share of the proceeds from sale of the properties that were mortgaged to Larson). However, and more importantly, payment by Western under the Third Amended Credit Agreement was *not* dependent upon receipt of money by Western pursuant to the Modular Home Sales Agreement, nor was the Modular Home Sales Agreement referred to nor incorporated into the Third Amended Credit Agreement.

In fact, in the Third Amended Credit Agreement the parties agreed that even if the "net proceeds" were insufficient for Western to make the payments pursuant to the schedule, Western remained obligated to make the payments as outlined in the Third Amended Credit Agreement. In other words, as relevant here, if Western made a profit selling the homes it was obligated under the Third Amended Credit Agreement to pay Larson at least as much as it received in net profits—up to the amounts specified in the Third Amended Credit Agreement. But even in the absence of net profits Western remained obligated to pay Larson pursuant to the terms of the Third Amended Credit Agreement.

Therefore, even if Western's 35% of the net profit under the Modular Home Sales Agreement was zero—because there were no sales, because Aspen misappropriated all the money from the sales, or for any other reason--Western remained responsible to make payment to Larson via some other source of money.   In summary, neither (1) Western's assertion that Aspen must be joined in this lawsuit because in Aspen's absence complete relief between Western and Larson is not possible, nor (2) Western's assertion that Aspen must be joined because the money owed to Larson by Western must come from the money generated by the Modular Home Sales Agreement are persuasive because Western is independently liable to Larson for plaintiff's claims. Guggenberger, 198 F. Supp. 3d at 1034.  The court finds Aspen is not a necessary party pursuant to Fed. R. Civ. P. 19(a)(1)(A).

### 3. Whether Aspen Claims An Interest In The Subject Matter Of This Litigation And Whether That Interest Would Be Impeded By Aspen's Absence From This Litigation Under FED. R. CIV. P. 19(a)(1)(B)(i).

The next inquiry under Rule 19 is to determine whether, under Rule 19(a)(1)(B)(i), Aspen claims an interest in the subject matter of this litigation and if so, whether that interest would be impeded by Aspen's absence from this litigation.  First, the court notes that though Western has now twice tried to bring Aspen into this litigation, Aspen itself has never affirmatively claimed an interest.   American Ins. Co. v. St. Jude Medical, Inc. 597 F. Supp. 2d 973, 978 (D. Minn. 2009) ("the plain language of Rule 19(a)(1)(B) requires that a person not only have an interest related to the subject of the action, but that person must affirmatively 'claim an interest' ").

Regarding this basis for adding a party, "the mere fact the underlying litigation will affect or otherwise impact a non-party's interests does not mean the non-party is indispensable." Guggenberger, 198 F. Supp. 3d. at 1034 (citing Cummins, 313 F.R.D. at 102).

Western concedes Aspen is not a party to the contract which forms the center of this dispute (the Third Amended Credit Agreement). Western theorizes, however, that because Larson's mortgage on Aspen's properties secures Western's debt to Larson, Aspen has an interest in the subject matter of this litigation which will be impeded if Aspen is not joined. Western also asserts that because Western assumed Aspen's obligations to Larson, Aspen is a third party beneficiary of the credit agreement (including the Third Amended version)—and therefore Aspen has an interest in this litigation.

Larson counters that the subject matter of this litigation is the contractual debt Western owes to Larson, not Aspen's property interests that secures said debt. Larson contends Aspen's sole interest is in its Canadian property holdings—not the amount of money owed by Western to Larson.

The court observes that Aspen *appears* to have signed a document entitled "Amendment No. 2 to collateral mortgage" (Docket No. 107-55) which is dated August 9, 2012, and coincided with the First Amended Credit Agreement (Docket No. 107-54) which is also dated August 9, 2012. The first Amended Credit Agreement increased the total amount Larson agreed to loan to Western (after December 10, 2012) to $7.4 million, including the amounts in the revolving note and revolving credit. See Docket 107-54. Likewise, Aspen's

collateral mortgage dated in August, 2012, agreed to increase the amount of the mortgage securing Larson's loan to Western to $7 million. Docket 107-55.

The amount of the debt (if any) owed by Western to Larson and the manner in which Larson chooses to collect any such debt are two wholly distinct issues. Aspen is not bound by any contract between Western and Larson which sets the amount of money Western owes Larson, even assuming Aspen is a "third party beneficiary" of such a contract. "Under basic common law contract doctrine, borne by simple justice, a third party cannot be bound to a contract without his consent in some form." White v. National Football League, 92 F.Supp.2d 918, 922 (D. Minn. Mar. 30, 2000).

Aspen's only concern is the amount of Larson's collateral mortgage upon Aspen's property which secures Western's debt to Larson. Foreclosure on the mortgage Larson holds on Aspen's Canadian property is only one such possibility of collecting against Western's debt. And, should the court find the Third Amended Credit Agreement is valid, that the dollar value of the corresponding collateral mortgage Larson holds upon Aspen's property does not equal the amount of the debt as outlined in the Third Amended Credit Agreement is of no concern to Aspen. Instead, that deficiency is a matter to be worked out between Larson and Western.

Should Larson choose to foreclose on its mortgage in order to collect its debt against Western, Larson would have to take any such legal action in Canada, because that is where Aspen's property upon which the mortgaged property is located. Finally, it appears Aspen now claims its principal, Greg

Jahnke, did <u>not</u> sign the 2nd amended collateral mortgage, and never agreed to increase the amount of Western's loan secured by the collateral mortgage to $7 million, let alone $17.5 million (as specified in the Third Amended Credit Agreement).  <u>See</u> Docket 107-65.  If that is the case, the amount of Western's loan secured by Aspen's mortgage is the amount described in the uncontested 1st amendment to the collateral mortgage agreement (up to $5 million of Western's debt—<u>See</u> Docket 107-33).  All of these issues surrounding the amount of Western's debt which is (or is not) secured by Aspen's collateral mortgage are issues which are separate and apart from the amount of Western's debt to Larson, and are issues which must be decided in the Canadian courts—not this court—because this court has no jurisdiction over any foreclosure action which Larson may try to bring against Aspen's real property located in Canada.  For all these reasons, the court finds Aspen does not claim an interest in the subject matter of this lawsuit which would be impeded by Aspen's absence from this litigation under FED. R. CIV. P. 19(a)(1)(B)(i).

### 4. Whether Western Risks Multiple Or Inconsistent Obligations If Aspen Is Not A Party To This Litigation.

The next inquiry is whether, under Rule 19(a)(1)(B)(ii), there is a risk Western will be subject to multiple or inconsistent obligations if Aspen is not made a party to this litigation.  Here, Western asserts the possibility exists that "this court may rule Western owes Larson all proceeds from sales of Aspen Village Project lands in which it held a mortgage to secure Western's debt, and a Canadian court may rule Western owes Aspen sixty-five percent of the net

profits of the sales of those same lands." This reference is clearly to the division of net profit proceeds arising out of the Modular Home Sales Agreement (Docket 107-22) wherein Aspen and Western agreed the net profit proceeds of the sales of subject properties would ultimately be divided between Aspen and Western on a 65%/35% basis. See id. at p. 4, § 2.02(e).

Larson responds that it has never requested a ruling from this court regarding division of the money from the sale of the Aspen Village project lands. Instead, Larson asserts, Western "merely owe[s Larson] the monies due under the Credit Agreement, as amended, and any amounts embezzled during the parties' relationship."

The only court that may be called upon to rule on the division of money based upon the Modular Home Sales Agreement (Docket 107-22), will be the court in Saskatchewan, Canada. The Modular Home Sales Contract (containing the 65-35 split), is solely between Aspen and Western, and it contains choice of law and forum selection clauses indicating it is governed by the law of Saskatchewan, Canada, and that the parties agree any disputes would be resolved there.

Further, as indicated above, this court cannot foresee any scenario in which it would have jurisdiction to preside over a dispute about Larson's foreclosure upon real property which is located in Saskatchewan, Canada, or the resulting division of proceeds therefrom. Those proceedings would necessarily all occur in Saskatchewan.

The dispute that is pending in this forum involves how much money (if any) Western owes to Larson. That amount of money may well be different than the amount of Western's debt that is ultimately determined by the courts of Canada to be collateralized by the mortgage granted to Larson by Aspen upon its property in Saskatchewan. That those numbers may not be the same may be problematic for Western, but it does not render Western subject to multiple or inconsistent obligations. In other words, that Western's debt to Larson may not be completely collateralized by the Aspen mortgage does not mean that Western is subject to multiple or inconsistent obligations under Rule 19(a)(1)(B)(ii). Aspen—the guarantor or partial guarantor of Western's debt-- is therefore not a necessary party under Rule 19(a)(1)(B)(ii).

**C.    Whether Aspen Should Be Joined Under Fed. R. Civ. P. 20 (Joinder of Permissive Parties)**

Alternatively, Western asserts Aspen should be joined as a permissive party under FED. R. CIV. P. 20. That rule provides in relevant part:

> **Rule 20.    Permissive Joinder of Parties**
> **(a)    Persons Who May Join or Be Joined.**
> **\*\***
>
> > **(2)    Defendants.** Persons—as well as a vessel, cargo, or other property subject to admiralty process in rem—may be joined in one action as defendants if:
> > > (A)    any right to relief is asserted against them jointly, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
> > > (B)    any question of law or fact common to all defendants will arise in the action.

"It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." Bailey v. Bayer Cropscience

L.P., 563 F.3d 302, 308 (8th Cir. 2009) (citing Temple v. Sythes Corp. Ltd. 498 U.S. 5,7 (1990)).  Instead, tortfeasors with joint and several liability are merely "permissive" parties.  Id.    However, "Rule 20 aims to promote 'trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits.' " Sparks Constructors, Inc. v. Hartzell Hardwoods, Inc. 2015 WL 7075964 at *3 (E.D. Mo, Nov. 13, 2015) (citing Mosley v. General Motors, 497 F.2d 1330, 1332 (8th Cir. 1974).   And although joinder of claims, parties and remedies is strongly encouraged, permissive joinder under Rule 20 is "not applicable in every case." Mosley, 497 F.2d at 1332-33.  A court retains discretion to deny permissive joinder and retain jurisdiction over the action.  Bailey v. Bayer Cropscience L.P. 563 F.3d 302, 308 (8th Cir. 2009).

1.    **Whether Western's Claim To Relief Against Aspen Is Asserted Jointly Or With Respect To The Same Transaction Or Occurrence And Whether There Are Common Questions of Law And Fact Pursuant to Fed. R. Civ. P. 20(a)(2)(A) & (B).**

Western asserts Aspen should be joined as a permissive party under Fed. R. Civ. P. 20(a)(2)(A) because Aspen "may be" jointly liable for the tort claims Larson has asserted against Western.  Specifically, Larson has asserted fraud and conversion claims against Western related to the distribution of funds from the sale of the Aspen properties to end-customers.  Western asserts it was Aspen, not Western, who misappropriated funds—both from the sale of the modular homes and from the money that was loaned to Western from Larson.

Regarding the misappropriation of the funds generated by the sale of the modular homes, Western asserts Aspen failed to pay the amounts Aspen owed

Western according to the Modular Home Sales Agreement. Western also asserts payment of the money generated by the sale of homes to end customers was handled by Aspen's law firm—McKercher. Further, Western asserts, some of the sale proceeds were diverted to pay Aspen's outstanding tax liabilities rather than reimbursing Western or satisfying Western's debt to Larson. Finally, Western asserts, Aspen misappropriated sale proceeds from one of the homes by installing it on a non-Aspen Village land, selling the home to an end customer, and using the proceeds to pay Aspen's tax liabilities, saddling Western with the debt used to purchase the modular home. Therefore, Western argues, to the extent the sale proceeds were distributed at Aspen's direction and/or were improperly directed, Aspen is potentially liable as a joint tortfeasor for any alleged conversion of funds.

Western argues Aspen should be joined for another reason: Western asserts it may want to seek contribution from Aspen. The basis for this claim is that Western asserts Aspen improperly inflated the amount of Western's debt to Larson by failing to adequately supervise progress on the Aspen Village project, and by submitting invoices for and requesting funds to be drawn from Western's revolving note for work that was not actually performed. Western asserts Greg Jahnke's mismanagement of the project exacerbated manufacturing defects and code violations on the modular homes and created installation, structural, and other construction defects which greatly increased the costs of the Aspen Village project and the amounts ultimately charged to Western's revolving note.

Western further urges Aspen should be joined as a permissive party under Fed. R. Civ. P. 20(a)(2)(B) because it (Western) has substantial claims against Aspen that are logically related to the issues in this lawsuit, and there are numerous questions of law and fact that are common among the parties. The common questions of law and fact cited by Western include: (1) the validity and enforceability of the Credit Agreement and its various amendments; (2) the amount, if any, Western owes Larson under the Credit Agreement; (3) the proper collection calculation and distribution of proceeds from the sales of Aspen Village Project homes an properties to end-customers; (4) responsibility for construction defects and costs of correcting those defects; and (5) ownership of the Aspen Village homes and properties.

Larson does not directly address the merits of Western's claims regarding Aspen's culpability for the alleged misallocation or misuse of the money based upon Aspen's alleged breach of the terms of the Modular Home Sales Agreement. Neither does Larson address Western's claim that Aspen is responsible for Western over-borrowing on its revolving loan from Larson based upon inappropriate or fraudulent requests from Aspen for money to be used on the Aspen Village project. Instead, Larson merely reiterates that Aspen should not be joined because it is likely not subject to personal jurisdiction in this court, Western has already once tried (unsuccessfully) to add Aspen to this lawsuit, and Larson would be prejudiced by adding Aspen as a party at this late date. Furthermore, Larson argues, even assuming Aspen is liable to Western for some of the money Western is ultimately found to owe Larson, that

is an issue purely between Aspen and Western—and one that Western should pursue in some other forum.

The "same transaction or occurrence" requirement of Rule 20 is a flexible concept and should be read as broadly as possible whenever doing so is likely to promote judicial economy. Sparks Constructors, 2015 WL 7075964 at * 3 (citing Travelers Ins. Co. v. Intraco, Inc., 163 F.R.D. 554, 556 (S.D. Iowa 1996)). A case by case approach is appropriate to determine whether a particular factual situation constitutes a single transaction or occurrence under Rule 20. Id. (citing 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 1653 at p. 389) (hereinafter "Wright & Miller"). One such interpretation is that if the events are "logically related" they are generally regarded as comprising a transaction or occurrence under Rule 20, and absolute identity of all the events is not necessary. Sparks, 2015 WL at 7075964 *4 (citing 7C Wright & Miller at § 1653, p. 270).

The court concludes the events recounted by Western as justifying joining Aspen as a permissive party are logically related. Nevertheless, the court declines to join Aspen as a permissive party under Rule 20. The transaction upon which Larson seeks relief in this lawsuit is the Third Amended Credit Agreement. That agreement is based upon Larson's loan of funds to Western. Though, at some earlier date, Larson also had loaned money to Aspen, Aspen is not obligated under the Third Amended Credit Agreement to repay any amount to Larson. Instead, the only party obligated to repay Larson under the terms of the Third Amended Credit Agreement is Western.

Though Western may have intended the Modular Home Sales Agreement to be a source of funds to repay Larson's loan to Western, whether Western and Aspen adhered to the terms of the Modular Home Sales Agreement is of no consequence to Larson under the Third Amended Credit Agreement. Likewise, the claims Western wishes to assert against Aspen are not dependent upon Larson's claim against Western. Western is free to assert those claims in another forum.

Western's claim against Aspen is based upon the Modular Home Sales Agreement. Western claims Aspen breached the Agreement by keeping all the sales proceeds for itself instead of properly dividing them 65%/35%, which would have allowed Western to pay Larson. Western also claims Aspen improperly or fraudulently submitted invoices for work that was performed badly or not at all by Aspen on the Aspen Village project. Because only Western, not Aspen, could draw from the revolving note, (see the terms of the Credit Agreement, Docket 107-30, p. 7), Western asserts Aspen's improper or fraudulent invoices caused Western to "over-borrow" on its loan from Larson. But these claims by Western against Aspen—though logically related to Western's ability to pay Larson, are for Western and Aspen to sort out, and at bottom, need not involve Larson at all.

Most importantly, joining Western's claims against Aspen in this lawsuit will do nothing to promote judicial economy. Sparks, 2015 WL 7075964 at * 3. Western's claims against Aspen center primarily upon Aspen's failure to abide by the Modular Home Sales Agreement, which contains a forum selection

clause indicating Saskatchewan, Canada is the exclusive forum for resolving disputes. Western's claims against Aspen must therefore be litigated in Canada. Furthermore, foreclosure on Aspen's Canadian property is likewise a proceeding that must occur, if at all, in Canada. Permissive joinder under Rule 20 is "not applicable in every case." <u>Mosley</u>, 497 F.2d at 1332-33. In this case, joining Aspen would create more problems than it would solve. The court therefore exercises its discretion to deny permissive joinder, but retain jurisdiction over this action. <u>Bailey</u>, 563 F.3d at 308.

## CONCLUSION and ORDER

For the reasons explained in this Memorandum Opinion, it is ORDERED: defendants' motion to amend the scheduling order and to join necessary, or alternatively permissive parties (Docket 109) is DENIED.

DATED this 11th day of December, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge