UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LARSON MANUFACTURING COMPANY OF SOUTH DAKOTA, INC., SUPERIOR HOMES, LLC, | 4:16-CV-04118-VLD |
| Plaintiffs, | MEMORANDUM OPINION AND ORDER [CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT, DOCKET NOS. 82 AND 111] |
| vs. | [FOR RULE 56(D) RELIEF, DOCKET NO. 100] |
| WESTERN SHOWCASE HOMES, INC., AMERICAN MODULAR HOUSING GROUP, LLC, AMERICAN MODULAR HOUSING GROUP, INC., PAUL THOMAS, | [TO ALLOW SUPPLEMENTAL BRIEFS, DOCKET NO. 133] |
| Defendants. | |

**INTRODUCTION**

This matter is before the court based on diversity jurisdiction, 28 U.S.C. § 1332, after defendants removed the matter from South Dakota state court. The parties have consented to this magistrate judge handling their case pursuant to 28 U.S.C. § 636(c).

Plaintiff Larson Manufacturing Company of South Dakota, Inc. (Larson) is the parent company of plaintiff Superior Homes, LLC (Superior). Superior is in the business of manufacturing and selling modular homes.

Defendant Western Showcase Homes, Inc. (Western) is in the business of purchasing, reselling, and financing modular homes. Defendants American Modular Housing Group, LLC (AMHG, LLC), and American Modular Housing

Group, Inc. (AMHG, Inc.), buy and resell modular homes. Paul Thomas is the principal agent and owner of both AMHG entities and Western.

The defendant entities purchased modular homes from Superior and then re-sold those homes to customers, sometimes arranging for delivery, set and completion of the home at the customer's location. Larson and Superior extended credit to the defendant entities for these purchases; AMHG would then repay the loans when its customer paid the defendant entities.

The second amended complaint recites that defendant entities placed orders for fourteen modular homes with plaintiffs. Plaintiffs constructed the homes. Of the homes that were delivered to defendants, full payment was never made even though the complaint alleges the ultimate customers who received these homes paid defendants. Other modular homes ordered by defendants were custom-built and never delivered because defendants never paid for the homes. As to the homes plaintiffs retain possession of, plaintiffs allege the custom nature of the homes makes resale of the homes at a reasonable value impracticable.

In addition, Larson entered into a loan agreement with Western which was guaranteed by AMHG, Inc. This loan agreement ultimately encompassed $14 million in funds. Larson alleges Western defaulted on the loan and AMHG, Inc. refused to pay pursuant to its guarantee. For all these matters, plaintiffs assert three counts of breach of contract, two counts of fraud, two counts of conversion, one count each of debt and guarantee, and one count of piercing

the corporate veil.[1]  Plaintiffs also allege defendant Thomas converted money which was received from third parties and intended for plaintiffs but was instead used by Mr. Thomas for his own personal use.

In their answer to the second amended complaint, defendants generally deny nearly all of plaintiffs' allegations.  Defendants Western and AMHG, Inc., assert five counterclaims against Larson and Superior.[2]  Those counterclaims include breach of contract (failure to pay rebates, failure to repay personal loans from Thomas and failure to provide future promised business); unjust enrichment (rebates, warranty and service fees); tortious interference with business expectancy (Aspen Links Country Club and Aspen Village Properties); breach of contract (manufacturing defects in modular homes); and fraud and deceit (fraudulent inducement to sign a mortgage in connection Aspen Village and McKenzie Lane, assignment of mortgage interest in Moose Ridge, fraudulent building practices).  Defendants/counterclaim plaintiffs Western

_____

[1] The plaintiffs' first amended complaint contained several additional claims. See Docket 1-6.  During the course of this litigation in federal court, however, the parties reached a settlement agreement regarding several of the claims contained within the first amended complaint and the defendants' counterclaims against the plaintiffs which were associated with those settled claims.  As a result of the settlement agreement, the parties agreed to dismiss the affected claims/counterclaims in this lawsuit.  Plaintiffs eventually moved to compel enforcement of the settlement agreement (Docket 31), and the court granted that motion.  Docket 50.  Thereafter, the plaintiffs filed their second amended complaint, which appears to have deleted the claims which are the subject of the settlement agreement.  Docket 58.  Likewise, the defendants filed their amended counterclaim, which appears to have deleted the counterclaims which are the subject of the settlement agreement. Docket 57.

[2] These counterclaims were stated in the defendants' amended counterclaim, Docket 57.

and AMHG, Inc. seek compensatory and punitive damages on their counterclaims, pre-and post-judgment interest, attorney's fees, and other remedies.

Now pending are the parties' cross-motions for partial summary judgment, Docket Nos. 86 and 111. Also pending is defendants' motion for Rule 56(d) relief (Docket No. 100), and defendants' motion to allow supplemental briefs (Docket No 133). During the pendency of these motions, the parties moved the court to extend the second amended scheduling order (Docket 135), which the court granted in part and denied in part (Docket 137).

## FACTS

These facts are gleaned from the parties' statements of undisputed material facts (Docket Nos. 84 and 113) and their objections to the same (Docket Nos. 101 and 123), along with the affidavits and supporting documents submitted by the parties. Properly supported facts and objections have been incorporated, but improperly supported facts and objections have not. <u>See</u> FED. R. CIV. P. 56(c)(1).

In addition to their own statement of undisputed facts in support of their motion for partial summary judgment (Docket 113) and their objection to the plaintiffs' statement of undisputed facts (Docket 101), the defendants submitted a statement of additional material facts (Docket 102) in response to the plaintiffs' motion for partial summary judgment.

Docket 102 consists of the same facts submitted in support of the defendants' motion for summary judgment, in addition to an almost verbatim

reiteration of Thomas's affidavit (Docket 104).  Mr. Thomas's affidavit is his version of the relationship--beginning to present--between parties and non-parties Larson, Superior, Western, AMHG, and Aspen.  Many of the facts recited in Mr. Thomas's affidavit pertain to the relationship between Aspen and Western and whether those entities fulfilled their obligations pursuant to the Modular Home Sales Agreement.  For the reasons explained in this court's Memorandum Opinion and Order denying defendants' motion (Docket 109) to join Aspen as a party, the court views very few of the facts pertaining to the relationship between Aspen and Western as material to this litigation.

**A.    Parties**

Plaintiff Larson is a South Dakota corporation with its principal place of business in Brookings, South Dakota.  Plaintiff Superior is a South Dakota limited liability company, the members of which are residents of South Dakota.  Superior's majority owner is Larson, but Superior conducts its own business separate and apart from Larson, with its own employees and accounts.

Defendant Western is a corporation formed under the laws of Nevada with its principal place of business in Las Vegas, Nevada.  Defendant AMHG, LLC is a limited liability company formed under the laws of Nevada.  Defendant AMHG, Inc. is a corporation formed under the laws of Saskatchewan, Canada, with its principal place of business located in Las Vegas, Nevada.  Defendant Paul Thomas is a resident of Las Vegas, Nevada, and is the sole owner of Western and both AMHG entities.

**B.     Greg Jahnke and the Aspen Village Project**

Defendants and Greg Jahnke, the president of Aspen Village Properties, had a business relationship involving the Aspen Village project in Emerald Park, Saskatchewan, Canada.  Superior manufactured modular homes for the Aspen Village project.

The Aspen Village project was a significant project.  It first contemplated the development of numerous residential living units, including high density multi-family, and single-family residences.  It also included the McKenzie Lane project, which involved the construction of nineteen condominium units. Finally, it included the Emerald Park project, which consisted of Aspen Links Country Club, including the associated golf course and clubhouse; Block XX and twenty-four other separately parceled lots near the Aspen Links Country Club ready for residential development; Blocks VV, WW, YY and ZZ; and other real property suitable for residential and/or commercial development.

Near the end of 2011, the defendants entered into an agreement with Aspen Village that provided the defendants the opportunity to acquire a 25% ownership interest in a new entity (Aspen Village Developments).  Also in 2011, Western agreed to purchase two modular homes from Superior.

**C.     Larson's Loans to The Aspen Entities**

Plaintiffs, Western, and the Aspen entities negotiated a series of agreements to formalize their commercial relationship.  In 2011, Larson entered into a loan agreement with Aspen Village Properties, Ltd. (hereinafter "Aspen") through which Larson loaned Aspen 2.3 million (Canadian) dollars.

The loan agreement included a series of documents (a promissory note, a collateral mortgage, and an assignment of leases and rents) to secure Aspen's debt to Larson. At that time, Greg Jahnke, the president of Aspen, also signed a personal guarantee for the loan. Although the original mortgage agreement encumbered many of the lands to be developed for the Aspen project, it did not encumber the parcels on which the McKenzie Lane project condominium units were to be situated.

**D.    The Credit Agreement and Amendments to the Credit Agreement**

Subsequently, on April 24, 2012, Western and Larson entered into a credit agreement through which Western assumed Aspen's obligations under the loan agreement, the principal balance of which was $2,247,191.30 (US dollars) at the time, plus accrued interest of $71,060.50 (US dollars). The term note related to Aspen's debt on the Aspen Village project lands. These funds were also used to settle external bills and liens against the Aspen Village project properties and to pay for the two homes that Superior had manufactured in 2011.

Western and Larson agreed to form a revolving credit facility ("revolving note") in the amount of $2.7 million to fund further progress on the Aspen Village project. The credit agreement, and particularly the revolving loan, was intended to finance the residential development of the Aspen Village project. A portion of the money advanced by Larson to Western under the amended credit agreement was used to purchase modular housing units from Superior.

Pursuant to the credit agreement, Western executed a term note in the amount of $2,247,191.30 (US dollars) and a revolving note in the amount of $2.7 million (US dollars). Interest accrued on the amounts loaned pursuant to the notes and credit agreement at the rate of 9.95% per annum.

In exchange for Western's assumption of its debt, Aspen agreed that its prior collateral mortgage and assignment of leases and rents would continue to secure the amounts and obligations Western assumed or owed Larson under the credit agreement.

Through these transactions, therefore, Western was indebted to Larson for $5 million, with $2.3 million related to the term note for debt related to the Aspen Village project lands and $2.7 million related to the revolving note to fund further progress on the Aspen Village project.

The credit agreement expressly states:

> **Section 4.2 Payment of Revolving Note:** The revolving note shall be due and payable as follows: (i) the minimum required revolving note payment shall be due and payable immediately upon the sale of any residential unit, and (ii) the remaining principal balance of the revolving note and all accrued but unpaid interest on the revolving note shall be due and payable on the revolving credit expiration date. Without limiting the generality of the foregoing, no interest on any note shall be payable until the sale of a residential unit, provided that all accrued and unpaid interest on the notes shall be due and payable in full on the term note maturity date or the revolving credit expiration date, as applicable, whether or not any residential units have been sold.

The credit agreement does not specify that Western was to repay its obligation with the exact funds paid by purchasers; it only provides that a minimum payment must be made on the revolving note when a sale of a modular home unit to an end customer occurs. The parties disagree about

whether Larson was required to obtain a South Dakota lending license to lawfully enter into the credit agreement(s).

As early as July, 2012, the maximum amount of the initial revolving note was reached. Larson and Western subsequently amended the credit agreement three times, though Western disputes the validity of the third amendment. The first amendment was made on August 9, 2012, and temporarily increased the revolving note to $4.7 million (US dollars). The second amendment to the credit agreement was made on December 10, 2012, and increased the amount of the note to $7 million (US dollars). The second amendment set a date of June 30, 2014, for payment of the $7 million, which represented the total amount of both the term and revolving notes. As consideration for the increase in the limit for the note to $7 million, Western was required to pay Larson an additional $500,000.00.

Simultaneously with the first and second amendments to the credit agreements, other documents were signed to secure the debt. These documents were signed by Greg Jahnke—the president of Aspen Village—who still retained an ownership interest in the Aspen Village land. Specifically, in August, 2012, Aspen amended the collateral mortgage and assignment of leases and rents to substitute new collateral land for a parcel that had been previously sold, and to revise the amount of Western's debt that was collateralized by Aspen's property to $7 million.[3]

_____

[3] It appears, however, that Greg Jahnke and Aspen may now be contesting the validity of the second amended collateral mortgage. See Docket No. 107-65. Mr. Jahnke's lawyer asserts Paul Thomas signed the second amendment to the

But when the time came to sign the third amendment to the credit agreement, seeking to again increase the amount of Larson's loan to the defendants, Aspen/Greg Jahnke withdrew cooperation and refused to sign the third amended credit agreement or the counterpart documents which would have secured Western's debt to Larson up to an amount of $17 million.

The final amendment to the credit agreement (the third amendment) was entered into on May 20, 2015, between Western and Larson. There are a signature lines for Western, Larson, and Aspen Village Properties on the third amended credit agreement. Signatures appear on the signatures lines for Western and Larson, but not on the signature line for Aspen. Likewise, neither Greg Jahnke nor anyone else on behalf of Aspen signed the (1) collateral mortgage agreement on behalf of Aspen Village Properties; (2) the acknowledgment and agreement between the lender, borrower, and Aspen; or (3) the assignment of leases and rents on behalf of Aspen Village Properties, all three of which are referred to in the third amendment as "conditions" in § 4 of the third amended credit agreement.

The defendants assert the absence of Greg Jahnke's signature on the third amended credit agreement along with his refusal to execute the counterpart documents (the amendment to the collateral mortgage by Aspen in favor of Larson and the amendment to the Aspen's assignment of leases and

_____

credit agreement as "President of Aspen," but that Thomas has <u>never</u> been an officer, director or shareholder of Aspen. <u>Id</u>. Thomas' signature as "President of Aspen" was discovered in a search of real property records by Aspen's lawyer. <u>Id</u>.

rents in favor of Larson, both of which are referred to in the third amended credit agreement as "conditions,") renders the third amended credit agreement invalid and unenforceable.

In § 3 of the third amended credit agreement, the distinction between the debt assumed by Western and the line of credit was eliminated and replaced with a principal balance of previously advanced money, totaling $8,633,038.69 (US dollars) plus accrued interest of $1,141,833.66 (US dollars), both as of March 31, 2015. Western also acknowledged its liability to Larson for an additional $1,854,767.00, which obligation Western had assumed from AMHG, Inc. under a separate agreement.

Section 3 of the third amended credit agreement revised the previous §§ 4.1 and 4.2 of the second amended agreement, and contained the following language:

> The borrower shall use its best commercial efforts to complete and market the properties that are mortgaged to the lender for the obligations of the borrower to the lender. The borrower shall pay all net sales proceeds for any disposition of such properties to the lender until all obligations to the lender have been fulfilled. Net sales proceeds shall me (sic) the total sales proceeds less reasonable adjustments and selling costs (including but not limited to legal fees in respect to such sale). Notwithstanding the foregoing and regardless of whether there are sufficient sales to achieve the payments referred to below, all amounts owing by the borrower to the lender as set forth above and any additional amounts owing by the borrower for matters occurring and additional advances made, if any, after March 21, 2015, including for greater certainty, all principal, interests, costs, and other amounts due and payable by the borrower to the lender, are due and payable by minimum payments as follows:

Section 3 also revised the former § 4.2 and extended the time for Western to repay the loan. The third amended agreement established a set payment

schedule, which required Western to repay the principal and interest in four payments: (1) $660,000 by June 30, 2015; (2) $2,640,000 by September 1, 2015; (3) at least half the remaining principal and interest on or before December 15, 2015; and (4) the remaining balance by March 31, 2016 (all in US dollars).  Larson could, but was not required, to make additional advances up to $600,000 (US dollars) prior to September 1, 2015.

Though the first amendment to the credit agreement contains a provision indicating it is governed by the law of South Dakota, the third amended credit agreement contains a provision (§ 15) indicating it is governed by the law of Saskatchewan, Canada.  Each amendment to the credit agreement contains a paragraph allowing Larson to recover its reasonable attorney's fees and expenses incurred in the enforcement of the credit agreement.

The defendants now dispute the accuracy of the way the dollar amounts in the third amended credit agreement were computed.  For example, the defendants now claim the amounts included in the third amended credit agreement (1) improperly included significant interest, even interest that accrued during delays caused by the plaintiffs; (2) a 25% add-on to account for the exchange rate between US dollars and Canadian dollars between 2011 and 2015; (3) numerous costs and expenses to remedy manufacturing and construction defects caused by Superior, including costs and expenses for work that was not performed; (4) amounts for the purchase of modular homes that should have been charged to Aspen; (5) funds that Larson paid on Aspen's behalf; and (6) the increased cost of each modular home by 4%.

Despite defendants' current disagreement with the computations in the third amended credit agreement, Paul Thomas explained in his affidavit that at the time he signed the third amended credit agreement in which he agreed to this amount, in order "to be a good soldier."  See Thomas affidavit, Docket 104, ¶¶ 115-116.

On the same day he signed the third amendment to the credit agreement on behalf of Western, Paul Thomas signed a guarantee on behalf of AMHG, Inc. The guarantee document obligated AMHG, Inc. to be liable for the obligations of Western under the third amended credit agreement for an initial total up to $14 million (US dollars), which limit increased over time as follows:

> The liability of the guarantor pursuant to the terms of this guarantee shall be limited to the total amount of $14,000,000.00 USD, plus interest at the rate equivalent to 5% above the CIBC floating prime rate of interest established from time to time by Canadian Imperial Bank of Commerce (CIBC)as its base rate used to determine rates of interest on Canadian dollar loans to customers in Canada and designated as the "prime rate."

At the time the guarantee was executed, the CIBC's prime rate was 2.85%. CIBC has changed the prime rate four times since the guarantee was executed as follows:

| | |
|---|---|
| July 15, 2015: | 2.70% |
| July 13, 2017: | 2.95% |
| September 2, 2017: | 3.20% |
| January 18, 2018: | 3.45% |

The defendants do not dispute that Mr. Thomas signed the guarantee on behalf of AMHG, Inc. nor do they dispute the content of the guarantee.  The defendants contend, however, that because the third amended credit agreement is invalid and unenforceable, likewise AMHG, Inc.'s guarantee

agreeing to be liable for Western's obligations pursuant to the third amended credit agreement is also invalid and unenforceable.

Contained within the third amended credit agreement is the following paragraph:

> 9. Release: The borrower hereby releases, acquits, and forever discharges each of the Lender and each and every past and present subsidiary, affiliate, stockholder, officer, director, agent, servant, employee, representative, and attorney of any of them from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorney's fees) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, which the Borrower may have or claim to have now or which may hereafter arise out of or be connected with any act of commission or omission of the ender (sic) existing or occurring prior to the date of this Amendment or any instrument executed prior to the date of this Amendment including, without limitation, any claims, liabilities, or obligations arising with respect to the indebtedness evidences (sic) by the Credit Agreement or any agreement related thereto. The provisions of this Section shall survive payment of all Obligations and shall be binding upon the Borrower and shall inure to the benefit of the Lender and its successors and assigns.

Western did not make the payments as outlined in the third amended credit agreement, and AMHG, Inc. did not make the payments pursuant to its guarantee. Following Western and AMHG, Inc.'s failure to pay pursuant to the third amended credit agreement, plaintiffs commenced this lawsuit.

### E. The Collateral for the Credit Agreement

In December, 2011, Aspen Village Properties executed a collateral mortgage of some of its specified property (up to an amount of $5 million dollars) in favor of Larson. When Western assumed Aspen's debt pursuant to the credit agreement dated April 24, 2012, Aspen Village Properties and Larson executed an amendment to the December, 2011, collateral mortgage between

14

Aspen Village and Larson. The amended collateral mortgage acknowledged Larson's mortgage upon the properties that the Aspen entities previously pledged and that Aspen Village properties still owned, resulting in these properties continuing to serve as collateral for the term and revolving notes that were now owed by Western to Larson (see Docket 107-33).

Similarly, on April 24, 2012, Larson, Western, and Aspen Village properties executed an amendment to the prior assignment of leases and rents acknowledging that the leases and rents continued to serve as collateral for the term and revolving notes, now owed by Western to Larson.

The parties disagree about whether these amended collateral mortgages and amended assignments of leases and rents were conditions precedent to, integral to, or affected the validity of the amended credit agreement(s). And, as explained above, there were no such accompanying documents signed to serve as collateral for the third amended credit agreement between Larson and Western.

**F.    Attempts to Save the Project**

In 2014, Bill Retterath, Jeff Reif, and Craig Johnson, members of Larson's management team, worked with Western to make further progress on the Aspen Village project. Mr. Retterath proposed that Western accept delivery of two condominium units (the "Aspen condo units") Superior had constructed and that had been stored at Superior's manufacturing facility for over eighteen months.

To facilitate this proposal, Larson requested a separate individual mortgage for the Aspen condo units to complete the construction and spur sales toward completion of the Aspen Village project. At that time (as of December 21, 2014) AMHG, Inc. owed Superior $1,761,904.67 pursuant to their November 5, 2014, purchase agreement (for two five-plexes—see Docket 124-5), as well as the advances to cover allowances made to that date. Superior assigned the collectability of the $1,761,904.67 debt to Larson, and AMHG, Inc. assigned its responsibility for that debt to Western. AMHG, Inc. pledged its interest in the McKenzie Lane project condominium parcels as collateral for the debt owed to Larson, and Larson therefore prepared and presented a mortgage agreement, which AMHG, Inc. accepted and signed.

The parties disagree about why construction halted. The plaintiffs contend it was because Larson had advanced more than the amount provided for in the purchase agreement between the parties dated November 5, 2014. The defendants assert plaintiffs caused delays in the funding of the Aspen Village construction throughout the project "to review invoices and requisitions." Larson continued to hold a mortgage on the Aspen condominium units.

In January, 2015, plaintiffs proposed amending the credit agreement a third time to consolidate Western and AMHG, Inc.'s debts. In May, 2015, Paul Thomas signed the third amended credit agreement. Greg Jahnke refused to sign the third amended credit agreement or the counterpart amended collateral mortgage and amended assignment of leases and rents.

16

**G.    Current Ownership/Status of the Properties**

On November 23, 2016, to facilitate completion and sale, AMHG, Inc. transferred its interest in the development property to Larson.  This was memorialized by a document entitled "transfer agreement," which was signed by Jeff Reif on behalf of Larson and Paul Thomas on behalf of AMHG, Inc.  See Docket 107-110.

The parties disagree about whether this transfer immediately impacted the amount Western owes Larson under the third amended credit agreement, but they do agree proceeds from the future sale of the development property could affect the amount due and owing under the third amended credit agreement.

An introductory paragraph within the November, 2016 transfer agreement states as follows:

> **AND WHEREAS** AMHG is indebted to Larson pursuant to a credit agreement between Western Showcase Homes, Inc. as borrower and Larson as Lender dated as of April 24, 2012 as amended by Amendment No. 1 to the Credit Agreement dated August 9, 2016 (sic) and as further amended by Amendment 2 to the Credit Agreement dated as of December 10, 2012 and as further amended by Amendment 3 to the Credit Agreement dated as of May 20, 2015 (collectively referred to as the "**Credit Agreement**")

Defendants concede this language exists in the transfer agreement, but dispute that this language in any way operates as an acknowledgement of the validity or enforceability of the third amended credit agreement.

Under the transfer agreement, proceeds of the sale of the development property are to be allocated as follows:  first to outstanding liability owed by AMHG, Inc. to third party Mauri Gwyn Developments, Ltd. and to expenses

related to completion and sale of the development property; second, to the extent proceeds remain, to Western and AMHG, Inc.'s obligations under the third amended credit agreement/guarantee or; third, if those obligations have been satisfied, to Western.

Both before and after Larson and Western's execution of the third amended credit agreement, some of the modular homes were sold.  The parties disagree, however, about who controlled the distribution of the proceeds from the sales and whether those proceeds were properly distributed to pay down Western's debt to Larson.

Plaintiffs assert the defendants controlled the distribution of the proceeds; defendants assert Aspen controlled the distribution of the proceeds. The documents produced by the parties indicate the McKercher Law Firm in Regina, Saskatchewan, Canada, distributed the proceeds.  The plaintiffs contend McKercher, LLP Law firm represents Aspen *and* defendants, while defendants contend McKercher acted solely at the direction of Aspen. Aspen/Jahnke used the proceeds of the sales of at least one of the modular homes which post-dates the third amended credit agreement (the Ottawa home, which sold in August, 2016) to pay past-due Canadian tax liens owed by Aspen/Jahnke, thus depriving Western of those sale proceeds to pay down its debt to Larson.  At least two more homes have sold since the date the parties entered into the third amended credit agreement, but the plaintiffs have not reduced the amount of Western's debt nor have plaintiffs accordingly abated the running of interest on Western's debt.   Additionally, the funds plaintiffs

claim the defendants converted have been co-mingled with other funds.

Larson recently entered into a contract for the sale of the development property. In its response to defendants' statement of facts, Larson contends it has been unable to complete the sale because of this pending litigation. It is unknown whether or how much of the proceeds from this sale will be applied to Western's obligation under the third amended credit agreement.

## DISCUSSION

### A.    Summary Judgment Standards

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Once the movant has met

its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  <u>Anderson</u>, 477 U.S. at 256; Fed. R. Civ. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  <u>Anderson</u>, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Id.</u> (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  <u>Id.</u> at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  <u>Id.</u> at 250.

The mere fact that both parties have filed cross-motions for summary judgment does not necessarily mean that no genuine dispute of a material fact exists; nor do cross-motions constitute a stipulation to the court's disposition of the case by motion. Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983); Barnes v. Fleet Nat'l. Bank, 370 F.3d 164, 170 (1st. Cir. 2004). Rather, cross-motions require the court to evaluate each motion independently and determine whether that movant is entitled to judgment as a matter of law. C. Line, Inc. v. City of Davenport, 957 F. Supp. 2d 1012, 1024-25 (S.D. Iowa 2013); St. Luke's Methodist Hosp. v. Thompson, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001).

## B.    What Law Applies

As explained above, this lawsuit is pending in federal court in the District of South Dakota based upon diversity of citizenship. "It is of course well-settled that in a suit based on diversity of citizenship jurisdiction the federal courts apply federal law as to matters of procedure but the substantive law of the relevant state." Hiatt v. Mazda Motor Corp., 75 F.3d 1252, 1255 (8th Cir. 1996) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)). As explained in Jacobs ex rel. Estate of Jacobs v. Evangelical Lutheran Good Samaritan Society, 849 F. Supp. 2d 893, 897 (D.S.D. 2012), a choice of law analysis for a diversity action in federal court is a substantive question for Erie purposes, so the choice of law rules of the forum state are applied to determine the parties' rights. Id. (citing Allianz Ins. Co. v. Sanftleben, 454 F.3d 853, 855 (8th Cir. 2006)).

As explained in the FACTS section above, the first versions of the credit agreement contained a clause indicating that South Dakota law would apply to their interpretation.  The third amended credit agreement, however, the validity and enforceability of which is the subject of this lawsuit, contained a clause indicating the law of Saskatchewan, Canada, would apply to interpret the document.

The parties' initial briefs cited South Dakota law exclusively.  Upon request by the court, however, the parties addressed the choice of law clause contained within the third amended credit agreement and whether the law of Saskatchewan, Canada, should apply to determine the validity of the third amended credit agreement.  See Docket Nos. 127 and 130.

Both parties agree South Dakota follows the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS (1971) to resolve questions about which law should govern in a particular factual situation.  Dunes Hospital, LLC v. Country Kitchen International, Inc., 623 N.W.2d 484, 488 (S.D. 2001).  Both parties also agree if there is no conflict between South Dakota law and Saskatchewan law, there is a "false conflict" and the court need not engage in a choice-of-law analysis.  Prudential Ins. Co. of America v. Kamrath, 475 F.3d 920, 924 (8th Cir. 2007).

Larson urges if there is a conflict, Saskatchewan applies, because the choice-of-law clause within the third amended credit agreement complies with South Dakota's conflict of law rules.  Western urges if Saskatchewan and South Dakota laws conflict, South Dakota law should apply, because under the

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1971), South Dakota has the most significant relationship to the cause of action.

"In South Dakota, a stipulation that provides the governing law is permitted." Dunes Hospital, LLC, 623 N.W.2d at 488. The parties to a contract may agree to be bound by the law of a particular jurisdiction through a valid choice of law clause in the contract. Id. Conflict of law rules become applicable only when the law intended by the parties to apply to the contract is not otherwise expressed within the contract. American Service Mutual Insurance Co. v. Bottum, 371 F.2d 6, 11 (8th Cir. 1967).

In this instance, the parties expressly indicated within the third amended credit agreement that Saskatchewan law applied. The Restatement honors choice of law clauses contained within contracts unless,

> either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . .

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(a) -(b) (1971). The court finds neither condition of § 187(2) is met, so the parties' choice of law clause in the third amended credit agreement is valid.

First, Saskatchewan has a substantial relationship to the parties and the transaction because the modular homes which were being financed by the credit agreement and the development in which they were being placed were in Saskatchewan. Further, one of the AMHG entities (AMHG, Inc.), which is

wholly owned by defendant Thomas, and which is the guarantor of the third amended credit agreement, is incorporated in Saskatchewan.[4]

Western argues application of Saskatchewan law *might be* contrary to the fundamental policy of South Dakota. But to meet the requirements of part (b) of § 187(2) of the Restatement, the application of Saskatchewan law must be contrary to a fundamental policy of South Dakota *and* South Dakota must have a materially greater interest than Saskatchewan in the determination of whether the third amended credit agreement is valid.

Western argues South Dakota does have a materially greater interest than Saskatchewan in determining whether the third amended credit agreement is valid. Specifically, Western asserts "given South Dakota's stringent standards for lender licensing, it is apparent that any application of Saskatchewan law that would free [Larson] from those domestic requirements would be contrary to the settled public policy of South Dakota." But neither party has explained how Saskatchewan law applies to Western's assertion that the third amended credit agreement is invalidated by Larson's lack of a lending license. Western concedes that "the applicability of the Trust and Loan Corporations Act, 1997[5] to the current circumstances is not absolute, and if Saskatchewan law were found to apply, answering that question would require

---

[4] The guarantee which was signed by Paul Thomas on behalf of AMHG, Inc. also specifies that it is governed in all respects by the laws of Saskatchewan. See Docket 85-7, p. 3.

[5] This is the Saskatchewan statute which Western asserts is applicable to the issue of whether Larson was required to have a Saskatchewan lender's license in order to enter into the credit agreement with Western.

a great deal of legal analysis and perhaps more significantly, factual investigation." Western concedes the state of the current record does not provide definitive answers.

The court cannot conclude application of Saskatchewan law would be contrary to a fundamental policy of South Dakota, or that South Dakota has a materially greater interest than Saskatchewan in the determination of the validity of the third amended credit agreement. The court therefore concludes the choice of law clause in the third amended credit agreement is valid. Saskatchewan law applies.

## C.    Plaintiffs' Motion for Partial Summary Judgment (Docket 82)

Plaintiffs move for partial summary judgment on the claims contained in counts 6 (debt) and 7 (guarantee) of their amended complaint (Docket 58). Count 6 (debt) is based upon the third amended credit agreement (Docket 85-6; Docket 107-95), which was signed by Paul Thomas on behalf of Western and AMHG, Inc. and by Bill Retterath on behalf of Larson. Count 7 (guarantee) is based upon the guarantee document (Docket 85-7) that was signed by Paul Thomas on behalf of AMHG, Inc.

### 1.    Whether the Third Amended Credit Agreement is Enforceable.

Plaintiffs assert that because the amount of money owed by the defendants to the plaintiffs is clearly established by the third amended credit agreement and by the guarantee, and because the defendants have made no payments to the plaintiffs pursuant to the terms of those documents, they are

entitled to summary judgment against the defendants for the prescribed amounts.

### a. Whether Larson was Required to Obtain a Lender's License.

Western does not dispute it has not paid any of the amounts owed under the terms of the third amended credit agreement, but instead argues the third amended credit agreement is invalidated by Larson's failure to obtain a lender's license. In their initial briefs, the parties cited South Dakota law regarding the effect of Larson's failure to obtain a lending license upon the validity of the third amended credit agreement. See Docket Nos. 83, 103, 116. In their supplemental briefs (Docket Nos. 127 and 130), neither party cites authority supporting or negating the premise that, under Saskatchewan law, Larson's failure to obtain a lending license invalidates the third amended credit agreement.

The burden is on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Here, the burden is on Larson to show the third amended credit agreement is a valid, enforceable contract pursuant to Saskatchewan law. Once Larson has met its burden, Western may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)). The underlying substantive law of

Saskatchewan identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 248. Larson claims its lack of a lending license has no effect upon the validity of the contract (the third amended credit agreement), but Larson does not address the effect of Saskatchewan law upon this crucial issue. Neither does Western. The court is therefore unable to evaluate whether, under the law of Saskatchewan, Larson's failure to obtain a lender's license affects the validity and enforceability of the third amended credit agreement.

**b. Whether the Conditions Within the Third Amended Credit Agreement Were Conditions Precedent to the Validity of the Agreement.**

Next, Western asserts the third amended credit agreement is invalid and unenforceable because three out of five items that were characterized as "conditions" in the third amended credit agreement did not come to fruition. The five "conditions" contained in the third amended credit agreement appear in § 4. They are as follows:

(a) execution and delivery of an Acknowledgement and Agreement between the Lender, the Borrower, American Modular, and Aspen Village Properties Ltd. ("Aspen);

(b) receipt of an executed copy of this Agreement;

(c) execution of an amendment to the Collateral Mortgage provided by Aspen increasing the amount of the Mortgage to the maximum principal amount of $17,500,000.00 or such other amount acceptable to the Lender and its counsel;

(d) execution of an amendment to the Assignment of Leases and Rents by Aspen Village Properties Ltd. regarding the increase of the amount of the mortgage to an amount acceptable to Lender and its counsel;

(e) satisfactory evidence that the obligations of American Modular Housing Group Inc. have been assigned to Western Showcase Homes, Inc. and such obligations have been assumed by Western Showcase Homes, Inc.

See Docket Nos. 85-6 and 107-95 at § 4 (Conditions).  The conditions contained in paragraphs (a), (c) and (d) did not occur.  Here again, the parties cited South Dakota law, not Saskatchewan law, in their initial briefs.

In its supplemental brief, Larson did not address whether the non-occurrence of three of the conditions affected the validity of the third amended credit agreement under Saskatchewan law.  Western did address Saskatchewan law on this subject in its supplemental brief.

Saskatchewan law distinguishes between true conditions precedent and ordinary conditions.  Colliers McClocklin Real Estate Corp. v. Lloyd's Underwriters, 2003 SKQB 383 at ¶ 23 (citing G.H.L. Fridman, The Law of Contract in Canada at p. 415 (2d ed. 1986)).  No contract is formed without the fulfillment of a true condition precedent, but a contract may still be binding if an ordinary condition is not fulfilled.  Id.  "If a condition is a true condition precedent, there is no contract until it is satisfied.  If a condition is the other sort of condition, then, in the event of its non-fulfillment, there may still be a binding contract between the parties, depending on the way in which the innocent party, guiltless of any breach, reacts to a breach of the condition."  Id.

Under Canadian law, contingent conditions are true conditions precedent, while promissory conditions, which relate to the consideration provided by one party for performance of his obligations by the other party, are not.  Id.

The Colliers court provided another manner in which to identify a condition precedent:  The test for whether a condition is a "condition

precedent" is: "[I]in what event will a party be relieved of his undertaking to do that which he has agreed to do but has not yet done? . . . . [D]oes the occurrence of the event deprive the party who has further undertakings still to perform of substantially the whole benefit which it was the intention of the parties as expressed in the contract that he should obtain as the consideration for performing those undertakings?" Id. at ¶ 24 (citing S.M. Wadams, The Law of Contracts (4th ed. 1999) at pp. 428-430).

Western argues that under this Saskatchewan precedent, conditions (a), (c) and (d) were conditions precedent and because they were not fulfilled, the third amended credit agreement is void. Western reasons "due to Jahnke's failure to sign the required documents, the Western entities did not obtain the benefit of security interests in the . . . Aspen Village properties [and] the Western Entities have been deprived of 'substantially the whole benefit' of [the third amended credit agreement]." See Docket 130, p. 6.

This analysis wholly misstates and/or misunderstands the purpose of the conditions as stated in paragraphs (a), (c) and (d) of § 4 of the third amended credit agreement and/or the purpose of the underlying acknowledgement agreement, collateral mortgage, and assignment of leases and rents documents that were the subjects of those paragraphs.

The purpose of those conditions and the documents supporting those conditions was to collateralize—or provide some security for, Larson's loan to Western. Those conditions and the underlying documents were not for the benefit of Western. They were for the benefit of Larson. Western received its

intended benefit from the third amended credit agreement—Larson's modular homes and Larson's money.  Aspen's signature on the third amended credit agreement and on the counterpart acknowledgement, assignment of leases and rents, and collateral mortgage deprived Western of absolutely nothing, but it deprived Larson of a way to collect on the funds it agreed to loan to Western in the event Western did not pay.   Those documents would not have granted *Western* a security interest in Aspen's property—they would have granted *Larson* a security interest in Aspen's property.  Western, not Larson, is the party who, under the third amended credit agreement, "still has undertakings to perform" because Western has not paid the money it agreed to pay Larson under the terms of the agreement.

The court returns to the way to distinguish a true condition precedent from an ordinary condition as described in <u>Collier</u> (quoting from Fridman, <u>The Law of Contracts</u>).  A condition is an ordinary condition if, in the event of non-fulfillment there may still be a binding contract between the parties, depending on the way in which the non-breaching party reacts to a failure of the condition.  <u>Collier</u>, 2003 SKQB 383 at ¶ 23.  In this instance, Larson—despite the non-occurrence of the conditions outlined in paragraphs (a), (c) and (d)—nevertheless loaned the funds to Western and Western accepted the funds.  The court finds the conditions outlined in paragraphs (a), (c) and (d) were not conditions precedent and the fact that they did not occur did not render the third amended credit agreement invalid or unenforceable.

## 2. Whether a Genuine Issue of Fact Remains Regarding the Outstanding Amounts Due to Plaintiffs Under the Third Amended Credit Agreement and Guarantee.

Larson urges the court to find there is no genuine issue of material fact remaining for trial regarding the amount Western owes under the third amended credit agreement. Larson asserts no genuine issue of fact remains because (1) the parties entered into a valid contract; (2) they agreed to the amounts due and the pertinent interest rate as of the date the agreement was signed; and (3) Western has made no payment as required by the agreement.

Western asserts, however, that genuine issues of fact remain regarding the amount of its debt to Larson under the third amended credit agreement for the following reasons:

- Even though Paul Thomas agreed to the amounts recited in the third amended credit agreement, those amounts were not correctly computed.
- Larson improperly failed to credit Western's debt after some of the subject development properties were sold.
- Western disputes Larson's claim that Western controlled distribution of the funds when property was sold and disputes who has the funds for the properties that did sell.
- Western asserts that because the transfer agreement has now transferred ownership of its interest in the remaining development properties to Larson to allow Larson to sell it, and because Larson still holds a mortgage on some of Aspen's property (though the maximum dollar amount of the collateral mortgage is in dispute), the value of the property transferred to Larson plus Larson's collateralized property is greater than Western's debt ever was anyway—so Western really does not owe Larson any money at all.

The court first addresses Western's assertion that the amount of its debt as calculated in the third amended credit agreement was incorrect. Mr. Thomas submitted an affidavit indicating that before he signed the third

amended credit agreement, he doubted Western's calculations for the very same reasons he now claims.  Docket 104, ¶¶ 108-116.  In his affidavit, Mr. Thomas explains he signed the agreement anyway to "be a good soldier." Id. at ¶ 116.

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248. And, as explained in Section B above, the substantive law of Saskatchewan applies to determine the validity of the third amended credit agreement. Neither party has cited Saskatchewan law regarding Mr. Thomas's current claim that the third amended credit agreement is not binding upon Western because amount of debt owed by Western to Larson was not properly calculated therein.

Under South Dakota law, "one who accepts a written contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation, or other wrongful act by another contracting party."  LPN Trust v. Farrar Outdoor Advertising, Inc., 552 N.W.2d 796, 799 (S.D. 1996) (cleaned up).  See also SDCL 21-11-1:

> When through fraud or mutual mistake of the parties, or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.

In their answer to the plaintiffs second amended complaint (Docket 62) Western alleges plaintiffs' claims are voided by the doctrines of (among others) "void or voidable contract."  Id. p. 7.  In their amended counterclaim (Docket

57), the defendants did not overtly claim the third amended credit agreement was void but did assert (through their breach of contract claim) one of the underlying reasons Mr. Thomas now cites for disputing the accuracy of the computations in the third amended credit agreement (e.g. that Larson failed to provide appropriate rebates).

Defendants made further claims that correspond to Mr. Thomas's current assertions regarding the computations in the third amended credit agreement in their unjust enrichment counterclaim (e.g. that plaintiffs improperly withheld warranty and service fees).

In their breach of contract counterclaim, the defendants (without mentioning the third amended credit agreement) likewise echoed Mr. Thomas's current claim that the third amended credit agreement was not computed properly by asserting plaintiffs failed to correct manufacturing defects in the modular homes.

Defendants counterclaimed for fraud and deceit, though they did not overtly claim fraud in the inducement of the third amended credit agreement. Instead, the fraud counterclaim asserts plaintiffs fraudulently induced Mr. Thomas to execute a $17 million-dollar *mortgage* agreement, and to assign a $ 1.7 million-dollar mortgage interest in Moose Ridge.

This discussion is purely academic, of course, because the court has no idea what facts Mr. Thomas would need to show, under *Saskatchewan* law, to rescind the third amended credit agreement or recalculate the original amount due from Western to Larson under the third amended credit agreement.

Finally, Larson and Western dispute whether Larson has properly credited Western's debt pursuant to the terms of the third amended credit agreement for the properties that have been sold. That factual discrepancy is material for purposes of summary judgment even without knowing the relevant law of Saskatchewan as to whether Mr. Thomas should be allowed to rescind his contractual agreement to pay the amounts originally set out in the third amended credit agreement and/or guarantee on the grounds recited above.

The court concludes the conditions contained in the third amended credit agreement were not conditions precedent. That some of the conditions did not occur, therefore, did not prevent the third amended credit agreement from becoming a valid and enforceable contract. The court is unable at this time, however, to evaluate the effect of Saskatchewan law regarding whether Larson's failure to obtain a lending license upon the validity and enforceability of the third amended credit agreement. Genuine issues of fact remain regarding the validity and enforceability of the third amended credit agreement and the amount which remains due under the third amended agreement. Larson's motion for partial summary judgment as to counts 6 (debt) and 7(guarantee) of its second amended complaint is DENIED.

**D.    Defendants' Motion for Partial Summary Judgment (Docket 111)**

The defendants move for partial summary judgment on count 1 (breach of contract—Simon Unit); count 2 (breach of contract—Units C5452HTC1 & 2); count 3 (breach of contract—Unit C5383); count 4 (conversion—Aspen Units);

count 6 (debt); count 7 (guarantee) and count 9 (conversion) of plaintiffs' second amended complaint.

Counts 1-3 in plaintiffs' second amended complaint pertain to "undelivered" units. Specifically, the Simon unit, units C5452HTC1 & 2 and Unit C5383 (the "Watertown" units) have never been delivered to the defendants. As to all these undelivered units, the defendants assert the plaintiffs' claims relating to them cannot go forward because the plaintiffs have suffered no injury and incurred no damages.

Defendants further allege that, as to the plaintiffs' conversion claims found in counts 4 and 9, defendants breached no independent legal duty to the plaintiffs. In other words, the independent legal duty giving rise to tort liability must result from extraneous circumstances, not merely elements of breach of the contract.

## 1. Whether the Defendants are Entitled to Summary Judgment as to Counts 1-3 of the Second Amended Complaint.

The defendants assert that, as to the undelivered units which are the subject of counts 1-3 of plaintiffs' second amended complaint, the plaintiffs do not have standing and have suffered no actual damages, entitling the defendants to summary judgment as to those claims.

First, it does not appear to the court that the cost of the undelivered units was ever calculated into the amount of defendants' debt for purposes of the third amended credit agreement. See Docket 58 and the parties' statements of undisputed fact. See also Docket 80.

The defendants' claim that the plaintiffs do not have standing and/or suffered no damage as to the undelivered units therefore appears to fall outside the parties' agreement to be bound by the law of Saskatchewan as to interpretation of the third amended credit agreement.

The court therefore turns to the (non-Canadian) authority cited by the parties in their briefs as to whether defendants are entitled to summary judgment in their favor as to counts 1-3 of the second amended complaint.

The defendants first assert they are entitled to summary judgment as to the undelivered units because plaintiffs do not have standing to make a claim as to those units. The plaintiffs built the Simon unit and units C5452HTC1 & 2 and C5883, but all these units remain undelivered in the plaintiffs' Watertown factory. Plaintiffs allege defendants ordered these units,[6] but defendants deny they ordered them. As to the Simon unit, the plaintiffs allege

---

[6] The plaintiffs have submitted documentation that they assert shows defendants ordered the undelivered units. See Docket Nos. 124-8 & 9 (Simon unit); Docket Nos. 124-13 & 14; 124-15 &16 (Watertown units). These documents consist of copies of sales orders for the units. The sales orders each contain a signature page which instructs "SIGN HERE TO PROCEED WITH," but the signature line is blank. Instead, the plaintiffs have provided copies of email correspondence from Mr. Thomas purporting to instruct the plaintiffs to proceed with building the units.

The defendants deny that they ever ordered the Simon unit or the Watertown units. Specifically, in his affidavit, Paul Thomas states "under the policies and procedures by which homes were to be ordered from Superior, I maintain that I did not order these homes, and that there is no documentation that I did so." See Thomas affidavit, Docket 104, ¶ 145.

Neither Mr. Thomas nor the plaintiffs have indicated to the court the customary manner in which the parties contracted for the purchase of modular homes.

Mr. Simon paid AMHG for it, but rather than forward the money to plaintiffs, Paul Thomas kept the money for himself.  <u>See</u> Second Amended Complaint, Docket 58, ¶¶ 16-28.

The defendants assert that as to the undelivered units, the plaintiffs do not have standing to assert their breach of contract claims in counts 1-3.  As to the Simon unit, defendants assert that if anyone has standing to sue the defendants, it is Mr. Simon--who paid for the unit but didn't get it—not the plaintiffs, who built it but never delivered it.   As to the other undelivered units, the defendants assert plaintiffs have no standing to sue because they still have the units, and therefore have suffered no loss or injury.

To have standing to bring a lawsuit,

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized. . . (b) actual or imminent, not conjectural or hypothetical . . . Second there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.  Third, it must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision.

<u>Lujan v. Defenders of Wildlife, et. al.</u>, 504 U.S. 555, 561 (1992) (cleaned up). The essential question is "whether the person whose standing is challenged is a proper party to request adjudication of a particular issue."  <u>United States v. One Lincoln Navigator 1998</u>, 328 F.3d 1011, 1013 (8th Cir. 2003) (cleaned up).

The defendants assert because plaintiffs retain possession of the undelivered units, they could not have suffered any damages as to those units and therefore plaintiffs are not the proper party to request adjudication as to

those units. The plaintiffs counter, however, that a seller of wrongfully rejected goods may recover damages for those goods, even when the seller retains possession. <u>See</u> SDCL 57A-2-709.[7]

The plaintiffs contend the defendants ordered the undelivered units and plaintiffs custom built the undelivered units to the defendants' specifications—rendering the undelivered units difficult or impossible to sell to anyone else. The purpose of awarding damages in a breach of contract action is to put the injured party in the same position it would have been had there been no breach. <u>Lamar Advertising of S.D., Inc. v. Heavy Constructors, Inc.</u>, 745 N.W.2d 371, 376 (S.D. 2008).

Plaintiffs' current possession of the undelivered units does not mean they have suffered no damages, they argue, because they cannot simply sell the

---

[7] SDCL 57A-2-709 provides:

(1)    When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under § 57A-2-710, the price

      (a) of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer; and

      (b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.

(2)    Where the seller sues for the price he must hold for the buyer any goods which have been identified to the contract and are still in his control except that if resale becomes possible he may resell them at any time prior to the collection of the judgment. The net proceeds of any such resale must be credited to the buyer and payment of the judgment entitles him to any goods not resold.

(3)    After the buyer has wrongfully rejected or revoked acceptance of the goods or has failed to make payment due or has repudiated (§57A-2-610), a seller who is not entitled to the price under this section shall nevertheless be awarded damages for nonacceptance under § 57A-2-708.

units to someone else. Instead, plaintiffs argue, they are in a worse position than they would have been in had defendants honored their contract, because the plaintiffs incurred the expense of building the units but are now unable to recoup that expense because they are unable to resell the custom-built units on the open market.

Genuine issues of fact preclude summary judgment as to the undelivered units. In South Dakota, the essential elements of a contract are (1) the parties are capable of contracting; (2) the parties consent; (3) the object of the contract is lawful; (4) there is sufficient cause or consideration for the contract. See SDCL § 53-1-2. The existence of a valid express contract is a question of law for the court. Werner v. Norwest Bank of South Dakota, 499 N.W. 2d 138, 141 (S.D. 1993).

On this record, the court is unable to determine whether there ever was a valid contract between the parties for the defendants to purchase the undelivered units. Though the defendants have produced copies of the sales orders for these units, the documents are unsigned. The defendants provided copies of emails from Mr. Thomas purporting to instruct them to build the units to show Mr. Thomas's consent, but Mr. Thomas claims it was not acceptable procedure between the parties to accept a contract for the purchase of modular homes via email correspondence. Neither party, however, has explained the course of dealing between the parties to enable the court to evaluate this claim.

Furthermore, even assuming the court could determine whether valid contracts exist between the parties as to the undelivered units, a dispute remains as to the damages suffered by the plaintiffs, if any, because of the defendants' refusal to pay for or accept delivery of these units. Mr. Retterath explains in his affidavit that the plaintiffs "ha[ve] attempted to resell the Watertown units, but ha[ve] not been able to do so. [Plaintiffs'] general business practice is to build pre-ordered modular units to the specifications of the purchaser. [Plaintiffs] generally [do] not build modular units for speculative purchasers or keep an inventory of already-built modular units for purchase by future customers." See Retterath affidavit, Docket 124, ¶ 27.

Mr. Retterath does not explain in his affidavit what efforts plaintiffs have made to resell the undelivered units, so a determination cannot be made at this time whether those efforts have been "reasonable" pursuant to SDCL 57A-2-709(1). A genuine issue of fact therefore remains as to (1) whether valid contracts exists between the parties as to the undelivered units and; (2) if so, what, if any, damages plaintiffs have sustained as to the undelivered units. The defendants' motion for partial summary judgment as to counts 1-3 in the plaintiffs' second amended complaint (the undelivered units) is DENIED.

## 2. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Conversion Claims in the Second Amended Complaint.

In count 4 of the second amended complaint, the plaintiffs allege Superior supplied AMHG, LLC two five-plexes that were delivered to the Aspen Village project and that were funded under the credit agreement between Western and Larson. See second amended complaint, Docket 58, ¶¶ 46-48. Plaintiffs

further allege AMHG, LLC received payment for these units from final customers in 2012-2013, that Larson had a right to receive those payments, but AMHG, LLC, Western and Mr. Thomas interfered with Larson's receipt of those funds by converting the payments to their own use, all to Larson's detriment. Id. at ¶¶ 49-52.

In count 9 of their second amended complaint, the plaintiffs generally allege that Paul Thomas personally and through his businesses took possession and control of money and personal property belonging to the plaintiffs, and that the plaintiffs were harmed by Mr. Thomas's actions. See second amended complaint, Docket 58, ¶¶ 80-83.

The defendants articulate three theories in support of their motion for partial summary judgment as to the plaintiffs' conversion claims: (1) the independent legal duty doctrine; (2) the mere failure to pay a debt is not actionable as conversion; and (3) defendants did not interfere with plaintiffs' possessory interests. See Docket 112 at pp. 6-12.

Defendants assert their failure to pay pursuant to the terms of the credit agreement is nothing more than a breach of that contract, but plaintiffs assert Mr. Thomas went beyond breaching the credit agreement when he used his businesses to create an elaborate scheme to divert funds that were supposed to be used to repay money advanced by Larson pursuant to the credit agreement to instead pay Mr. Thomas's own personal expenses. The plaintiffs assert the defendant corporations (AMHG and Western) improperly used both sales proceeds and money advanced by plaintiffs by diverting it to Paul Thomas who,

41

in his personal capacity, had no right to the funds.  Therefore, the plaintiffs argue, they have shown breach of a duty which exists beyond the contractual duties between Western and Showcase.

In their brief in opposition to the defendants' motion for summary judgment (Docket 122, pp. 10-12) the plaintiffs cite evidence obtained through discovery which they assert shows how, on multiple occasions, the defendant companies improperly funneled funds to Paul Thomas's personal accounts, when those funds were supposed to be used for the business purposes outlined in the contract(s) between the parties or, if sales proceeds, were to be paid directly to the plaintiffs.

Both parties have cited extensively in their briefs to South Dakota law in support of their positions that the facts support their legal positions.  The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248.  Here, both parties agree that to prevail on the claims plaintiffs assert in the conversion causes of action, they must prove "a breach of a legal duty independent of contract."  Grynberg v. Citation Oil & Gas Corp., 573 N.W.2d 493, 500 (S.D. 1997).  Because the conduct which must be proved is necessarily independent of the contract (i.e. the third amended credit agreement), the parties and the court are freed from the constraints of Saskatchewan law.  The court therefore endeavors to determine the applicable South Dakota law to this portion of the parties' dispute.

The defendants first assert the plaintiffs' conversion claims do not satisfy the independent duty doctrine. The South Dakota courts have articulated the independent duty doctrine as follows: "It is settled law in South Dakota that a breach of duty may arise from a contractual relationship, and while matters complained of may have their origin in contract, the gist of an action may be tortious." Shipporeit v. Khan, 775 N.W.2d 503, 505 (S.D. 2009) (cleaned up).

The best summary of the independent tort doctrine in South Dakota case law is found in Grynberg, 573 N.W.2d at 500-503. There, the South Dakota Supreme Court explained the doctrine and cases in which it has accepted and declined the invitation to apply it. Id. The facts of Grynberg are as follows: the owners of oil and gas leases in oil fields brought a lawsuit against the operator (Citation) of the fields. As the operator, Citation was responsible for managing the exploration and production of the fields, as well as accounting for the owners' profits and expenses. Id. Eventually, a group of owners discovered Citation had been improperly accounting for money that had been invested by the owners—resulting in monetary benefit to Citation. Id. at 498, 505, n. 9. The owners sued Citation, alleging not only breach of contract, but also fraud. The owners sought compensatory and punitive damages. Grynberg, 573 N.W.2d at 497.

At trial, the owners prevailed on their breach of contract and fraud claims, and the jury awarded compensatory and punitive damages. Id. at 499. Citation appealed, arguing its actions did not give rise to an independent tort cause of action for fraud and punitive damages. Id. Though the South Dakota Supreme

43

Court found the jury's punitive damage award was excessive (id. at 507), it found Citation had committed a tort independent of its contract with the owners—so the fraud claim had properly been submitted to the jury. Id. at 501. In doing so, the court distinguished Grynberg from two earlier cases it had decided (Sundt v. State ex. rel. S.D. Dept. of Transportation, 566 N.W.2d 476 (S.D. 1997) and Fisher Sand & Gravel Co. v. State ex. re. S.D. Dept. of Transportation, 588 N.W.2d 864 (S.D. (1997)). In those two cases, the court had held that—despite their claims which sounded in negligence--no duty outside the contract existed to support the plaintiffs' negligence claims against the defendants. Grynberg, 573 N.W.2d at 501.

The Grynberg court began its analysis by acknowledging the principle that punitive damages are generally not recoverable in breach of contract actions because as a general rule, in such actions damages are limited to the actual pecuniary loss sustained. Grynberg, 573 N.W.2d at 500. The public policy reasons for this general rule are three: (1) breach of contract is generally a private injury unlike tort, which some authorities recognize as a public injury; (2) our free market system allows economically efficient breaches of contract; and (3) compensatory damages encourage reliance on business agreements, while the threat of punitive damages would create uncertainty and apprehension in the marketplace. Id.

Nevertheless, the court explained, most courts allow punitive damages in certain breach of contract cases, including conversion, fraud, breach of fiduciary duty, tortious interference with a business expectancy, intentional

breaches accompanied by willful acts of violence, malice or oppressive conduct, fraud, and breach of covenant of good faith and fair dealing.  <u>Id.</u>  Punitive damages are allowed in these instances when the plaintiff can prove an independent tort that is separate and distinct from the breach of contract.  <u>Id.</u>

"While the independent tort may occur at the time of and in connection with the breach, or may arise out of the same transaction, it is not committed merely by breaching the contract, even if such act is intentional."  <u>Id.</u> (cleaned up).  And "conduct which merely is a breach of contract is not a tort, but the contract may establish a relationship demanding the exercise of proper care and acts and omissions in performance that give rise to tort liability."  <u>Id.</u> (cleaned up).  Importantly, however, the fact that a contract exists between the plaintiffs and the defendants does not render the latter immune from the penalty that is ordinarily visited upon tortfeasors.  <u>Id.</u> at 501 (cleaned up).

Next, the court determined "the existence of a duty is a question of law." <u>Id.</u> at 501.  The question for the court to determine is whether the defendant owes the plaintiff a duty *outside* the contract to support their claims.  <u>Id.</u> (emphasis added).  In <u>Grynberg</u> the court determined Citation owed the plaintiffs "the legal duty which is due from every man to his fellow, to respect his rights of property . . . and refrain from invading them by . . . fraud."  <u>Id.</u> (cleaned up).  The <u>Grynberg</u> court held "a contract is not a license allowing one party to cheat or defraud the other."  <u>Id.</u>

The court then examined how the plaintiffs successfully proved fraud at trial –thereby justifying their independent tort claim and the punitive damage

award.  Id. at 502.  The Grynberg court explained the plaintiffs alleged

Citation's actions constituted the tort of deceit.  Id. at 502.  The court noted the

essential elements of deceit are:  (1) representation made as a statement of fact,

(2) which was untrue and known to be untrue by the party making it or

recklessly made; (3) the statement was made with the intent to deceive and for

the purpose of inducing the other party to act upon it; (4) the other party did

rely upon it; and (5) the other party was damaged.  The court found the

evidence presented at trial supported the conclusion that all the essential

elements of deceit had been proven.  Id.  The plaintiffs had relied on Citation's

false representations and were induced to allow Citation to continue as their

operator.  Id.  The court offered this explanation:

> In the so-called breach of contract actions that smack of tort
> because of the fraud and deceit involved, we do not think it is
> enough just to permit defendant to pay that which the . . . contract
> required him to pay in the first place.  If this were the law,
> defendant has all to gain and nothing to lose.  If he is not caught in
> his fraudulent scheme, then he is able to retain the resulting
> dishonest profits.  If he is caught, he has only to pay back that
> which he should have paid in the first place.

Id. (cleaned up).  The court explained that to hold otherwise would give the

defendant a "license to steal, undercutting the very policy reasons for

withholding punitives, i.e. to encourage reliance on business agreements."  Id.

In Schipporeit, the plaintiffs (purchasers) brought breach of contract,

conversion, and fraudulent misrepresentation claims against the seller of a

hotel property.  They claimed the seller did not include all the property he

claimed he would when he sold the hotel.  The court rejected the tort claims,

and in so doing, distinguished Grynberg.  Schipporeit, 775 N.W.2d at 506.  The

court explained that in <u>Grynberg</u>, "the tortious conduct involved more than the elements, i.e. terms of the contract, and were based, in part, on the nature of the ongoing relationship between the parties." <u>Id.</u> The court noted that in <u>Grynberg</u>, even though the conduct was related to and sprung from the underlying contract, the defendant's fraudulent practices caused the owners to agree to continue having the defendant manage their oil fields and caused the owners to end up paying excessive costs. <u>Id.</u>

Counts 4 and 9 of plaintiffs' second amended complaint allege the tort of conversion. "Conversion is the act of exercising control or dominion over personal property in a manner that repudiates the owner's right in the property or in a manner that is inconsistent with such right." <u>Ward v. Lange</u>, 553 N.W.2d 246, 251 (S.D. 1996). In their brief, the defendants assert that whether failure to pay a debt as opposed to the conversion of personal property can properly be the subject of a conversion action in South Dakota is an open question in South Dakota. <u>See</u> Docket 112 at p. 9. When faced with a question of state law of first impression in a diversity case, the federal court must try to predict how the state supreme court would rule if faced with the same issue. <u>Blankenship v. USA Truck, Inc.</u>, 601 F.3d 852, 856 (8th Cir. 2010).

The defendants cite <u>Denke v. Mamola</u>, 437 N.W.2d 205, 207 (S.D. 1989), for the proposition that it is the "general rule" that an action for conversion may be brought only for personal property. But the <u>Denke</u> court did not hold that a conversion action could not be brought for money. That lawsuit was

about whether a conversion action could be brought for real estate.  <u>Id.</u>  The court noted that a building attached to real property could be subject to a conversion action if the building was severed and removed from the real estate because under such circumstances, the building became personal property and was no longer part of the real estate.  <u>Id.</u> at p. 208.

And in <u>Ward</u>, the South Dakota Supreme Court recognized that a conversion action can be brought as to the wrongful taking of money—as opposed to personal property.   <u>Ward</u> 555 N.W.2d at 251.  In <u>Ward</u>, the plaintiff claimed conversion because the defendants (the nephews of the decedent) used their uncle's money for their own benefit without proper authorization.  In <u>Ward</u>, the defendants were, at the very least, mistaken about whether they were entitled to their uncle's money which they used for themselves.  The South Dakota Supreme Court affirmed summary judgment on the plaintiff's conversion claim against the nephews for the $18,000 of their uncle's money they wrongfully took for their own benefit.  <u>Id.</u>

The defendants cite <u>Albaugh, Inc. v. Arsonate Herbicide Products, Ltd.</u>, 2009 WL 10702988 at *10 (S.D. Iowa, Feb. 18, 2009) and cases cited therein for the proposition that the mere failure to pay a debt cannot provide the basis for a conversion action.   Here, however, the claims asserted in counts 4 and 9 of plaintiffs' second amended complaint allege something more:  the plaintiffs allege defendants not only failed to pay the debt, but took the money that was supposed to be used to pay the debt and either (1) in the case of advances, immediately diverted it to Mr. Thomas's personal use; or (2) in the case of sale

48

proceeds, instead of paying that portion of the proceeds that should have gone to plaintiffs, wrongfully diverted the money to Mr. Thomas. In similar circumstances, other courts have held that a claim for conversion is actionable. For example, in Sagez v. Global Agricultural Investments, LLC. 2014 WL 377072 (S.D. Iowa, July 31, 2014), the plaintiff investors sued the defendant for conversion (among other causes of action) after the defendant persuaded the plaintiffs to give the defendant money, which the defendant claimed he was using to set up a farming operation in Brazil. Id. at *1. In reality, the defendant was apparently doing nothing more than operating a ponzi scheme. Id. The investors eventually sued the defendant, claiming the defendant converted their money. Id. at * 5. The defendant moved to dismiss, but the court denied the motion as to the conversion claim. Id. at * 23. The court noted that "[a] person may commit conversion by obtaining the chattel through fraud or by using a chattel, properly within one's control, in an unauthorized manner." Id. (cleaned up). The court observed that taken as a whole, it was clear the plaintiffs alleged the defendant had used fraud to take control of the plaintiffs' money—they had therefore properly alleged conversion. Id. at 24.[8]

The Minnesota courts also allow for conversion claims as to unpaid debts. Cummins Law Office, P.A. v. Norman Graphic Printing Co. Ltd., 826 F.

---

[8] The Sagez case is distinguished because it was before the court on a 12(b)(6) motion to dismiss, whereas this case is before the court on a motion for summary judgment under Rule 56. Here, however, discovery is not yet complete. The plaintiffs in this case, however, have presented the court with at least some evidence the defendants obtained plaintiffs' money in a fraudulent manner, or once it was within the defendants' control, used it in an unauthorized manner. Sagez, 2014 WL 3779072 at *22.

Supp. 2d 1127, 1133 (D. Minn. 2011). In <u>Cummins</u>, the defendant (Norman) retained plaintiff Cummins to represent it in an action against a foreign company. Norman was to pay Cummins a retainer fee, plus a contingent fee based upon the amount recovered from the foreign company. Norman paid the retainer fee, but failed to pay the sizeable amount due to Cummins when Cummins successfully recovered a $2.4 million award for Norman through a settlement agreement. Cummins sued Norman under several theories, including conversion. <u>Id.</u> at 1133. Norman argued Cummins could not sue under a conversion theory because it could not identify the funds owed. The court rejected this theory—noting Cummins "identified" the funds owed as the funds paid under the settlement agreement. <u>Id.</u> at 1133. Furthermore, Minnesota law was clear that money could properly be considered personal property for purposes of a conversion claim. <u>Id.</u> <u>See also</u>, <u>Toomey v. Dahl</u>, 63 F. Supp. 3d 982, 1000 (D. Minn. 2014) (holding that under Minnesota law, "money is a valid basis for a conversion action."). The court refused to dismiss the plaintiff's conversion claims because plaintiff had a valid property interest in her money and defendant "deprived her of that interest when he accepted and refused to repay her advanced funds." <u>Id.</u>

A "legal duty . . . may spring from extraneous circumstances, not constituting elements of the contract . . . [e]ven though the conduct [is] connected with and dependent upon the contract." <u>Schipporeit</u>, 775 N.W.2d at 506. The tortious conduct (conversion) alleged by the plaintiffs in counts 4 and 9 of the second amended complaint is based upon the nature of the ongoing

relationship between the parties, as it was in <u>Grynberg</u>, and the plaintiffs have alleged the defendants' actions have caused them to incur excessive cost as a result. The plaintiffs cite evidence they assert proves the defendants exercised dominion or control[9] over money which repudiated the plaintiffs' right to the money, which was inconsistent with the terms of the contract, and which resulted in Paul Thomas exercising control over the money. Under South Dakota law, the defendants are not entitled to summary judgment as to counts 4 and 9 of plaintiffs' second amended complaint.

### 3. Whether Western is Entitled to Summary Judgment as to the Claims Contained in Counts 6 (Breach of Contract) and 7 (Guarantee) in the Second Amended Complaint.

Finally, the defendants move for partial summary judgment as to the claims contained in counts 6 (breach of contract) and 7 (guarantee) of the plaintiffs' second amended complaint. The defendants assert the same grounds in support of their motion for partial summary judgment as they did in their opposition to the plaintiffs' motion for partial summary judgment as to these counts. Namely, the defendants assert that the third amended credit agreement is invalid because the plaintiffs (1) failed to obtain a lender's license; and (2) because three of the five conditions listed in § 4.2 of the agreement did not occur. The court DENIES the defendants' motion for partial summary

---

[9] To the extent that defendants assert they are entitled to summary judgment based upon their claim they had no control of the sale proceeds, that argument is rejected for the reason explained in the FACT sections D and G, as well as the DISCUSSION Section C.2 of this opinion. Who controlled distribution of the proceeds upon the sale of the development properties is a matter which is hotly disputed by the parties in this lawsuit.

judgment in their favor as to counts 6 and 7 of the plaintiffs' complaint for the reasons it denied the plaintiffs' motion for partial summary judgment in their favor as to these same counts. These reasons are explained in Section C.1 of this Memorandum Opinion, above.

Namely, the court is unable to determine whether Larson's failure to obtain a lender's license has any affect whatsoever upon the validity or enforceability of the third amended credit agreement, because the parties have not explained how Saskatchewan law affects this issue, if at all. And for the reasons explained above, the court finds that, under Saskatchewan law, the conditions contained in § 4.2 of the third amended credit agreement are not conditions precedent. That conditions (a), (c) and (d) in § 4.2 of the third amended credit agreement did not occur, therefore, does not preclude the validity or enforceability of the agreement.

Finally, for the reasons already explained, the court finds there are genuine issues of fact regarding the amount which remains due and payable under the terms of the third amended credit agreement and the corresponding guarantee. For all these reasons, the defendants' motion for partial summary judgment as to counts 6 and 7 of the plaintiffs' second amended complaint is DENIED.

**E.    Defendants' Motion for Rule 56(d) Relief (Docket 100) and For Leave to File Supplemental Briefing (Docket 133)**

Finally, the defendants move for relief under FED. R. CIV. P. 56(d) (Docket 100) and for leave to file supplemental briefing (Docket 133). The court addresses these motions together because they are based upon the same

premise: discovery is incomplete, and the defendants believe further information will be forthcoming that may affect the court's ruling on the pending motions.

Federal Rule of Civil Procedure 56(d) provides:

> (d)     When Facts Are Unavailable to the Nonmovant.  If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>     (1) defer considering the motion or deny it;
>     (2) allow time to obtain affidavits or declarations or to take discovery; or
>     (3) issue any other appropriate order.

"Rule 56(d) reflects the principle that 'summary judgment is proper only after the nonmovant has had adequate time for discovery.' " Elkins v. Medco Health Solutions, 2014 WL 1663406 at *9 (E.D. Mo. Apr. 25, 2014) (citing Ray v. American Airlines, Inc., 609 F.3d 917, 923 (8th Cir. 2010).  The purpose of Rule 56(d) is to prevent a party from being unfairly thrown out of court by a premature motion for summary judgment.  In re: TMJ Litigation, 113 F.3d 1484, 1490 (8th Cir. 1997).  The rule should therefore be "applied with a spirit of liberality."  United States ex. rel. Bernard v. Casino Magic Corp., 293 F.3d 419, 426 (8th Cir. 2002).

Rule 56(d), however, is not a license for a fishing expedition, and cannot be used to block a properly made motion for summary judgment in the absence of some showing by the party seeking additional discovery that the motion has merit.  Duffy v. Wolle, 123 F.3d 1026, 1040 (8th Cir. 1997) abrogated on other grounds by Torgerson v. City of Rochester, 643 F. 3d 1031, 1043 (appx) (8th Cir. 2011).  The party seeking additional discovery under Rule 56(d) must do

more than speculate that it may discover additional facts which would overcome a motion for summary judgment.  Stanback v. Best Diversified Products, 180 F.3d 903, 911 (8th Cir. 1999).  The party seeking relief under 56(d) must submit, by affidavit, the specific facts that further discovery might uncover, or what information further discovery might reveal.  Anuforo v. Commissioner of Internal Revenue, 614 F.3d 799, 808 (8th Cir. 2010).

The court notes three things.  First, both parties filed their motions for partial summary judgment far in advance of the fact and expert discovery deadlines, and far in advance of the motion deadline set by the then-in-effect scheduling order in this case.  See Docket 94.  The scheduling order in effect at the time (Docket 94) set the fact discovery deadline for December 3, 2018, expert discovery deadline for March 1, 2019, and the motion deadline for April 1, 2019.  Plaintiffs filed their motion for partial summary judgment on May 23, 2018, and defendants filed their motion for partial summary judgment on July 25, 2018.

Second, the parties have recently jointly requested the court to amend the scheduling order to extend the time for discovery—and to extend the motion deadline.  See Docket 135.  The parties jointly agreed to extend fact and expert discovery until March, 2019 and requested the motion deadline be extended until April 22, 2019.  The court granted (in part) the parties' request to extend the scheduling deadlines—extending both fact and expert discovery until March 1, 2019 but leaving the motion deadline at April 1, 2019.  See Docket 137.  The basis for the parties' request to extend discovery was their joint

representation that discovery has been delayed due to the scope of the litigation, the location of the witnesses, documents and parties. All parties agreed more time was necessary to complete written discovery before eliciting additional depositions. Docket 135.

Third, as the court has repeatedly noted throughout this decision, to determine which facts are material, the court must know the substance of the pertinent law. Both sides inexplicably ignored their agreement to be bound by Saskatchewan law and cited exclusively to South Dakota law in their briefing of the pending motions—a waste of the court's time and their clients' money. Neither party has sufficiently briefed the key issues in this case according to the law by which they agreed to be bound—that of Saskatchewan, Canada. This, if for no other reason, necessitates further briefing on the pending motions for partial summary judgment.

In their motion for Rule 56(d) relief (Docket 100) and counsel's supporting affidavit, the defendants explained that discovery was "still in its infancy." Docket 107, p. 2. They were still exchanging written discovery and had not yet taken depositions. The plaintiffs also explained they had not completed any discovery regarding the information from the third (non-party)—Aspen. Id. at p. 3.

In their motion for leave to file supplemental briefs (Docket 133), and counsel's supporting affidavit (Docket 134), the defendants explain they have begun but not completed taking depositions in this matter. Counsel's affidavit explains the depositions taken so far have elicited information which raises the

need for more information and briefing regarding (1) the current ownership status of the property at issue in this case, and (2) the distribution of the funds from the sale proceeds of the same; and (3) Larson's money lending activity. Docket 134, p. 2.  See also, Docket 133, p. 2.  Though they agreed to the extension of time for discovery, plaintiffs oppose both defendants' motion for Rule 56(d) relief and for supplemental briefing.  Docket 136.

The most basic issue in this case remains hotly disputed:  the amount of money due from Western to Larson pursuant to the third amended credit agreement.  Key to resolving this issue is determining (1) how much money has been generated by the sale of the subject properties; and (2) how the proceeds have been distributed and allocated among the parties.

To answer these questions, the parties must determine *who* directed and controlled distribution of the proceeds and where the proceeds went.  To date, the parties cannot even agree on these basic issues.  The plaintiffs assert Thompson, Western, or Western's delegate (Laura Riffel) directed the McKercher Law firm how and to whom to distribute the money from the sale proceeds.  But the defendants assert a third party (Aspen)—through its law firm (McKercher) made all the decisions and distributed the money.  To date, it does not appear that Riffel or anyone from Aspen or McKercher has been deposed to shed any light on these issues.  To decide these motions for partial summary judgment in the absence of such basic information (just as an example) is premature.   The defendants have met their burden to show Rule 56(d) relief is appropriate, and that further briefing is necessary.  In light of the

parties' recent agreement and the court's order to extend the discovery date until March, however, and this court' instant ruling denying the parties' motions for partial summary judgment, defendants' motion for Rule 56(d) relief (Docket 100) and for leave to file supplemental briefing on motions for partial summary judgment (Docket 133) are DENIED AS MOOT. When discovery is complete, the parties may, within the current motion deadline, re-file whatever motions and briefs they deem necessary.

## CONCLUSION and ORDER

For the reasons explained above, IT IS ORDERED

Plaintiffs' motion for partial summary judgment (Docket No. 82) is DENIED without prejudice;

Defendants' motion for partial summary judgment (Docket No. 111) is DENIED without prejudice;

Defendants' motion for Rule 56(d) relief (Docket No. 100) and Defendants' motion for leave to file supplemental briefing on motions for partial summary judgment (Docket No. 133) are DENIED AS MOOT in light of the recently extended discovery deadline and the parties' opportunity to re-file motions and accompanying briefs within the court's current scheduling order.

DATED this 11th day of December, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge