UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| LARSON MANUFACTURING COMPANY OF SOUTH DAKOTA, INC., and SUPERIOR HOMES, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>WESTERN SHOWCASE HOMES, INC., AMERICAN MODULAR HOUSING GROUP, LLC, AMERICAN MODULAR HOUSING GROUP, INC., and PAUL THOMAS,<br><br>Defendants. | 4:16-CV-04118-VLD<br><br><br>**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTERS ROGATORY)** |

The United States District Court for the District of South Dakota presents its compliments to the appropriate judicial authorities of Canada and the Province of Saskatchewan and requests international judicial assistance to effect service of process and obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter. A trial on this matter is presently scheduled for Tuesday, August 20, 2019, at 9:00 a.m. in Sioux Falls, South Dakota, United States of America.

This Court requests the assistance described herein as necessary in the interests of justice. The appropriate judicial authorities of Canada and the Province of Saskatchewan are requested to effect service of process and compel the appearance of **Gregory Jahnke** to appear for a video-taped oral examination to be used as evidence at a trial in this matter under the United States' Federal Rules of Civil Procedure concerning dealings among Aspen Village Properties, Ltd., Aspen Village Developments, Ltd. ("Aspen Village Developments"),

Aspen Creek Developments, Ltd., Superior Homes, L.L.C. ("Superior"), Larson Manufacturing of South Dakota, Inc. ("Larson"), Western Showcase Homes, Inc. ("Western"), AmeriCan Modular Housing Group, Inc. ("AMGH, Inc."), AmeriCan Modular Housing Group, L.L.C. ("AMGH, LLC"), and Paul Thomas[1] relating to the Aspen Village Project.

- Name of Witness/Person to Be Served: Gregory Jahnke

- Nationality of Witness/Person to Be Served: Canadian.

- Address of Witness/Person to Be Served: P.O. Box 537 Station Main, White City, Saskatchewan, Canada, S41 5B1 or 310 Emerald Park Rd., Emerald Park, Saskatchewan, Canada, S4L 1B9.

- Description of Documents or Evidence to Be Produced: See below.

## BACKGROUND[2]

### A. Parties

Plaintiff Larson is a South Dakota corporation with its principal place of business in Brookings, South Dakota. Plaintiff Superior Homes, LLC is a South Dakota limited liability company, the members of which are residents of South Dakota. Superior's majority owner is Larson, but Superior conducts its own business separate and apart from Larson, with its own employees and accounts.

---

1. Throughout this letter rogatory, Plaintiffs Larson and Superior may be collectively referred to as "Plaintiffs," and Defendants Western, AMGH, LLC, and AMHG, Inc., and Paul Thomas may be collectively referred to as "Defendants" or the "Western Entities." Additionally, Gregory Jahnke and his various entities may be collectively referred to as the "Aspen Entities."

2. This statement of facts is taken from this Court's ruling on the parties' prior motions for partial summary judgment, to provide the Canadian court background regarding this dispute. By setting forth this statement of facts, the parties do not waive any right or ability to further contest the facts as set forth herein at trial or otherwise.

Defendant Western is a corporation formed under the laws of Nevada with its principal place of business in Las Vegas, Nevada. Defendant AMHG, LLC is a limited liability company formed under the laws of Nevada. Defendant AMHG, Inc. is a corporation formed under the laws of Saskatchewan, Canada, with its principal place of business located in Las Vegas, Nevada. Defendant Paul Thomas is a resident of Las Vegas, Nevada, and is the sole owner of Western and both AMHG entities.

### B. Greg Jahnke and the Aspen Village Project

Defendants and Greg Jahnke, the president of Aspen Village Properties, had a business relationship involving the Aspen Village project in Emerald Park, Saskatchewan, Canada. Superior manufactured modular homes for the Aspen Village project.

The Aspen Village project was a significant project. It first contemplated the development of numerous residential living units, including high density multi-family, and single-family residences. It also included the McKenzie Lane project, which involved the construction of nineteen condominium units. Finally, it included the Emerald Park project, which consisted of Aspen Links Country Club, including the associated golf course and clubhouse; Block XX and twenty-four other separately parceled lots near the Aspen Links Country Club ready for residential development; Blocks VV, WW, YY, and ZZ; and other real property suitable for residential and/or commercial development.

Near the end of 2011, the defendants entered into an agreement with Aspen Village that provided the defendants the opportunity to acquire a 25% ownership interest in a new entity (Aspen Village Developments, Ltd.). Also in 2011, Western agreed to purchase two modular homes from Superior.

### C. Larson's Loans to the Aspen Entities

Plaintiffs, Western, and the Aspen Entities negotiated a series of agreements to formalize their commercial relationship. In 2011, Larson entered into a loan agreement with Aspen Village Properties, Ltd. (hereinafter "Aspen") through which Larson loaned Aspen 2.3 million (Canadian) dollars. The loan agreement included a series of documents (a promissory note, a collateral mortgage, and an assignment of leases and rents) to secure Aspen's debt to Larson. At that time, Greg Jahnke, the president of Aspen, also signed a personal guarantee for the loan. Although the original mortgage agreement encumbered many of the lands to be developed for the Aspen Village project, it did not encumber the parcels on which the McKenzie Lane project condominium units were to be situated.

### D. The Credit Agreement and Amendments to the Credit Agreement

Subsequently, on April 24, 2012, Western and Larson entered into a credit agreement through which Western assumed Aspen's obligations under the loan agreement, the principal balance of which was $2,247,191.30 (US dollars) at the time, plus accrued interest of $71,060.50 (US dollars). The term note related to Aspen's debt on the Aspen Village project lands. These funds were also used to settle external bills and liens against the Aspen Village project properties and to pay for the two homes that Superior had manufactured in 2011.

Western and Larson agreed to form a revolving credit facility ("revolving note") in the amount of $2.7 million to fund further progress on the Aspen Village project. The credit agreement, and particularly the revolving loan, was intended to finance the residential development of the Aspen Village project. A portion of the money advanced by Larson to Western under the amended credit agreement was used to purchase modular housing units from Superior.

Pursuant to the credit agreement, Western executed a term note in the amount of $2,247,191.30 (US dollars) and a revolving note in the amount of $2.7 million (US dollars). Interest accrued on the amounts loaned pursuant to the notes and credit agreement at the rate of 9.95% per annum.

In exchange for Western's assumption of its debt, Aspen agreed that its prior collateral mortgage and assignment of leases and rents would continue to secure the amounts and obligations Western assumed or owed Larson under the credit agreement.

Through these transactions, therefore, Western was indebted to Larson for $5 million, with $2.3 million related to the term note for debt related to the Aspen Village project lands and $2.7 million related to the revolving note to fund further progress on the Aspen Village project.

The credit agreement expressly states:

> **Section 4.2 <u>Payment of Revolving Note:</u>** The revolving note shall be due and payable as follows: (i) the minimum required revolving note payment shall be due and payable immediately upon the sale of any residential unit, and (ii) the remaining principal balance of the revolving note and all accrued but unpaid interest on the revolving note shall be due and payable on the revolving credit expiration date. Without limiting the generality of the foregoing, no interest on any note shall be payable until the sale of a residential unit, <u>provided that</u> all accrued and unpaid interest on the notes shall be due and payable in full on the term note maturity date or the revolving credit expiration date, as applicable, whether or not any residential units have been sold.

The credit agreement does not specify that Western was to repay its obligation with the exact funds paid by purchasers; it only provides that a minimum payment must be made on the revolving note when a sale of a modular home unit to an end customer occurs. The parties disagree about whether Larson was required to obtain a South Dakota lending license to lawfully enter into the credit agreement(s).

As early as July, 2012, the maximum amount of the initial revolving note was reached. Larson and Western subsequently amended the credit agreement three times, though Western disputes the validity of the third amendment. The first amendment was made on August 9, 2012, and temporarily increased the revolving note to $4.7 million (US dollars). The second amendment to the credit agreement was made on December 10, 2012, and increased the amount of the note to $7 million (US dollars). The second amendment set a date of June 30, 2012, for payment of the $7 million, which represented the total amount of both the term and revolving notes. As consideration for the increase in the limit for the note to $7 million, Western was required to pay Larson an additional $500,000.00.

Simultaneously with the first and second amendments to the credit agreements, other documents were signed to secure the debt. These documents were signed by Greg Jahnke – the president of Aspen Village – who still retained an ownership in the Aspen Village land. Specifically, in August, 2012, Aspen amended the collateral mortgage and assignment of leases and rents to substitute new collateral land for a parcel that had been previously sold, and to revise the amount of Western's debt that was collateralized by Aspen's property to $7 million.[3]

But when the time came to sign the third amendment to the credit agreement, seeking to again increase the amount of Larson's loan to the defendants, Aspen/Greg Jahnke withdrew cooperation and refused to sign the third amended credit agreement or the

---

3. It appears, however, that Greg Jahnke and Aspen may now be contesting the validity of the second amended collateral mortgage. Mr. Jahnke's lawyer asserts Paul Thomas signed the second amendment to the credit agreement as "President of Aspen," but that Thomas has <u>never</u> been an officer, director, or shareholder of Aspen. Thomas's signature as "President of Aspen" was discovered in a search of real property records by Aspen's lawyer.

counterpart documents which would have secured Western's debt to Larson up to an amount of $17 million.

The final amendment to the credit agreement (the third amendment) was entered into on May 20, 2015, between Western and Larson. There are signature lines for Western, Larson, and Aspen on the third amended credit agreement. Signatures appear on the signature lines for Western and Larson, but not on the signature line for Aspen. Likewise, neither Greg Jahnke nor anyone else on behalf of Aspen signed the (1) collateral mortgage agreement on behalf of Aspen; (2) the acknowledgement and agreement between the lender, borrower, and Aspen; or (3) the assignment of leases and rents on behalf of Aspen, all three of which are referred to in the third amendment as "conditions" in § 4 of the third amended credit agreement.

The defendants assert the absence of Greg Jahnke's signature on the third amended credit agreement along with his refusal to execute the counterpart documents (the amendment to the collateral mortgage by Aspen in favor of Larson and the amendment to the Aspen's assignment of leases and rents in favor of Larson, both of which are referred to in the third amended credit agreement as "conditions"), renders the third amended credit agreement invalid and unenforceable.

In § 3 of the third amended credit agreement, the distinction between the debt assumed by Western and the line of credit was eliminated and replaced with a principal balance of previously advanced money, totaling $8,633,038.69 (US dollars) plus accrued interest of $1,141,833.66 (US dollars), both as of March 31, 2015. Western also acknowledged its liability to Larson for an additional $1,854,767.00, which obligation Western had assumed from AMHG, Inc. under a separate agreement.

Section 3 of the third amended credit agreement revised the previous §§ 4.1 and 4.2 of the second amended agreement, and contained the following language:

> The borrower shall use its best commercial efforts to complete and market the properties that are mortgaged to the lender for the obligations of the borrower to the lender. The borrower shall pay all net sales proceeds for any disposition of such properties to the lender until all obligations to the lender have been fulfilled. Net sales proceeds shall me (sic) the total sales proceeds less reasonable adjustments and selling costs (including but not limited to legal fees in respect to such sale). Notwithstanding the foregoing and regardless of whether there are sufficient sales to achieve the payments referred to below, all amounts owing by the borrower to the lender as set forth above and any additional amounts owing by the borrower for matters occurring and additional advances made, if any, after March 21, 2015, including for greater certainty, all principal, interests, costs, and other amounts due and payable by the borrower to the lender, are due and payable by minimum payments as follows:

Section 3 also revised the former § 4.2 and extended the time for Western to repay the loan. The third amended agreement established a set payment schedule, which required Western to repay the principal and interest in four payments (1) $660,000 by June 30, 2015; (2) $2,640,000 by September 1, 2015; (3) at least half the remaining principal and interest on or before December 15, 2015, and (4) the remaining balance by March 31, 2016 (all in US dollars). Larson could, but was not required, to make additional advances up to $600,000 (US dollars) prior to September 1, 2015.

Though the first amendment to the credit agreement contains a provision indicating it is governed by the law of South Dakota, the third amended credit agreement contains a provision (§ 15) indicating it is governed by the law of Saskatchewan, Canada. Each amendment to the credit agreement contains a paragraph allowing Larson to recover its reasonable attorney's fees and expenses incurred in the enforcement of the credit agreement.

The defendants now dispute the accuracy of the way the dollar amounts in the third amended credit agreement were computed. For example, the defendants now claim the amounts included in the third amended credit agreement (1) improperly included significant interest, even interest that accrued during delays caused by the plaintiffs; (2) a 25% add-on to account for the exchange rate between US dollars and Canadian dollars between 2011 and 2015; (3) numerous costs and expenses to remedy manufacturing and construction defects caused by Superior, including costs and expenses for work that was not performed; (4) amounts for the purchase of modular homes that should have been charged to Aspen; (5) funds that Larson paid on Aspen's behalf; and (6) the increased cost of each modular home by 4%.

Despite the defendants' current disagreement with the computations in the third amended credit agreement, Paul Thomas has explained in an affidavit that at the time he signed the third amended credit agreement in which he agreed to this amount, he did so in order "to be a good soldier."

On the same day he signed the third amendment to the third credit agreement on behalf of Western, Paul Thomas signed a guarantee on behalf of AMHG, Inc. The guarantee document obligated AMHG, Inc. to be liable for the obligations of Western under the third amended credit agreement for an initial up to $14 million (US dollars), which limit increased over time as follows:

> The liability of the guarantor pursuant to the terms of this guarantee shall be limited to the total amount of $14,000,000.00 USD, plus interest at the rate equivalent to 5% above the CIBC floating prime rate of interest established from time to time by Canadian Imperial Bank of Commerce (CIBC) as its base rate used to determine rates of interest on Canadian dollar loans to customers in Canada and designated as the "prime rate."

At the time the guarantee was executed, the CIBC's prime rate was 2.85%. CIBC has changed the prime rate four times since the guarantee was executed as follows:

| | |
|---|---|
| July 15, 2015: | 2.70% |
| July 13, 2017: | 2.95% |
| September 2, 2017: | 3.20% |
| January 18, 2018: | 3.45% |

The defendants do not dispute that Mr. Thomas signed the guarantee on behalf of AMHG, Inc. nor do they dispute the content of the guarantee. The defendants contend, however, that because the third amended credit agreement is invalid and unenforceable, likewise AMGH, Inc.'s guarantee agreeing to be liable for Western's obligations pursuant to the third amended credit agreement is also invalid and unenforceable.

Contained within the third amended credit agreement is the following paragraph:

> 9. Release: The borrower hereby releases, acquits, and forever discharges each of the Lender and each and every past and present subsidiary, affiliate, stockholder, officer, director, agent, servant, employee, representative, and attorney of any of them from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorney's fees) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, which the Borrower may have or claim to have now or which may hereafter arise out of or be connected with any act of commission or omission of the ender [sic] existing or occurring prior to the date of this Amendment or any instrument executed prior to the date of this Amendment including, without limitation, any claims, liabilities, or obligations arising with respect to the indebtedness evidences [sic] by the Credit Agreement or any agreement related thereto. The provisions of this Section shall survive payment of all Obligations and shall be binding upon the Borrower and shall inure to the benefit of the Lender and its successors and assigns.

Western did not make the payments as outlined in the third amended credit agreement, and AMHG, Inc. did not make the payments pursuant to its guarantee. Following Western and AMHG, Inc.'s failure to pay pursuant to the third amended credit agreement, plaintiffs commenced this lawsuit.

### E. The Collateral for the Credit Agreement

In December, 2011, Aspen executed a collateral mortgage of some of its specified property (up to an amount of $5 million dollars) in favor of Larson. When Western assumed Aspen's debt pursuant to the credit agreement dated April 24, 2012, Aspen and Larson executed an amendment to the December, 2011, collateral mortgage between Aspen and Larson. The amended collateral mortgage acknowledged Larson's mortgage upon the properties that the Aspen Entities previously pledged and that Aspen still owned, resulting in these properties continuing to serve as collateral for the term and revolving notes that were now owed by Western to Larson.

Similarly, on April 24, 2012, Larson, Western, and Aspen executed an amendment to the prior assignment of leases and rents acknowledging that the leases and rents continued to serve as collateral for the term and revolving notes, now owed by Western to Larson.

The parties disagree about whether these amended collateral mortgages and amended assignments of leases and rents were conditions precedent to, integral to, or affected the validity of the amended credit agreement(s). And, as explained above, there were no such accompanying documents signed to serve as collateral for the third amended credit agreement between Larson and Western.

### F. Attempts to Save the Project

In 2014, Bill Retterath, Jeff Reif, and Craig Johnson, members of Larson's management team, worked with Western to make further progress on the Aspen Village project. Mr. Retterath proposed that Western accept delivery of two condominium units (the "Aspen condo units") Superior had constructed, and that had been stored at Superior's manufacturing facility for over eighteen months.

To facilitate this proposal, Larson requested a separate individual mortgage for the Aspen condo units to complete the construction and spur sales toward completion of the Aspen Village project. At that time (as of December 21, 2014) AMHG, Inc. owed Superior $1,761,904.67 pursuant to their November 5, 2014, purchase agreement (for two five-plexes), as well as the advances to cover allowances made to that date. Superior assigned the collectability of the $1,761,904.67 debt to Larson, and AMHG, Inc. assigned its responsibility for that debt to Western. AMHG, Inc. pledged its interest in the McKenzie Lane project condominium parcels as collateral for the debt owed to Larson, and Larson therefore prepared and presented a mortgage agreement, which AMHG, Inc. accepted and signed.

The parties disagree about why construction halted. The plaintiffs contend it was because Larson had advanced more than the amount provided for in the purchase agreement between the parties dated November 5, 2014. The defendants assert plaintiffs caused delays in the funding of the Aspen Village construction throughout the project "to review invoices and requisitions." Larson continued to hold a mortgage on the Aspen condominium units.

In January, 2015, plaintiffs proposed amending the credit agreement a third time to consolidate Western and AMHG, Inc.'s debts. In May, 2015, Paul Thomas signed the third amended credit agreement. Greg Jahnke refused to sign the third amended credit agreement or the counterpart amended collateral mortgage and amended assignment of leases and rents.

### G. Current Ownership/Status of the Properties

On November 23, 2016, to facilitate completion and sale, AMHG, Inc. transferred its interest in the development property to Larson. This was memorialized by a document

entitled "transfer agreement," which was signed by Jeff Reif on behalf of Larson and Paul Thomas on behalf of AMHG, Inc.

The parties disagree about whether this transfer immediately impacted the amount Western owes Larson under the third amended credit agreement, but they do agree proceeds from the future sale of the development property could affect the amount due and owing under the third amended credit agreement.

An introductory paragraph within the November, 2016 transfer agreement states as follows:

> **AND WHEREAS** AMHG is indebtedness to Larson pursuant to a credit agreement between Western Showcase Homes, Inc. as borrower and Larson as Lender dated as of April 24, 2 012 as amended by Amendment No. 1 to the Credit Agreement dated August 9, 2016 (sic) and as further amended by Amendment 2 to the Credit Agreement dated as of December 10, 2012, and as further amended by Amendment 3 to the Credit Agreement dated as of May 20, 2015 (collectively referred to as the "**Credit Agreement**")

Defendants concede this language exists in the transfer agreement, but dispute that this language in any way operates as an acknowledgement of the validity or enforceability of the third amended credit agreement.

Under the transfer agreement, proceeds of the sale of the development property are to be allocated as follows: first to outstanding liability owed by AMHG, Inc. to third party Mauri Gwyn Developments, Ltd. and to expenses related to completion and sale of the development property; second, to the extent proceeds remain, to Western and AMHG, Inc.'s obligations under the third amended credit agreement/guarantee or; third, if those obligations have been satisfied, to Western.

Both before and after Larson and Western's execution of the third amended credit agreement, some of the modular homes were sold. The parties disagree, however, about

who controlled the distribution of the proceeds from the sales and whether those proceeds were properly distributed to pay down Western's debt to Larson.

Plaintiffs assert the defendants controlled the distribution of the proceeds; defendants assert Aspen controlled the distribution of the proceeds. The documents produced by the parties indicate the McKercher Law Firm in Regina, Saskatchewan, Canada, distributed the proceeds. The plaintiffs contend McKercher, LLP law firm represents Aspen *and* defendants, while defendants contend McKercher acted solely at the direction of Aspen. Aspen/Jahnke used the proceeds of at least of the modular homes which post-dates the third amended credit agreement (the Ottawa home, which sold in August, 2016) to pay past-due Canadian tax liens owed by Aspen/Jahnke, thus depriving Western of those sale proceeds to pay down its debt to Larson. At least two more homes have sold since the date the parties entered into the third amended credit agreement, but plaintiffs have not reduced the amount of Western's debt nor have plaintiffs accordingly abated the running of interest on Western's debt. Additionally, the funds plaintiffs claim the defendants converted have been co-mingled with other funds.

**QUESTIONS**

The Western Entities request that the appropriate judicial authorities of Canada and the Province of Saskatchewan effect service of process and compel the appearance of **Gregory Jahnke** to appear for a video-taped oral examination to be used as evidence at a trial in this matter under the United States' Federal Rules of Civil Procedure concerning dealings among Aspen Village Properties, Ltd., Aspen Village Developments, Ltd., Aspen Creek Developments, Ltd., Superior Homes, L.L.C., Larson Manufacturing of South Dakota, Inc., Western Showcase Homes, Inc., AmeriCan Modular Housing Group, Inc., AmeriCan

Modular Housing Group, L.L.C., and Paul Thomas relating to the Aspen Village project and regarding the following subjects:

1. Relevant information relating to the creation of or terms of the business relationship, contracts, agreements, transactions, loans, credit agreements, loans, debts, advances, financing agreements, mortgages, security agreements, assignments, or guarantees, between or among the Aspen Entities and Plaintiffs.

2. Relevant information relating to the creation of or terms of the business relationship, contracts, agreements, transactions, loans, credit agreements, loans, debts, advances, financing agreements, mortgages, security agreements, assignments, or guarantees, between or among the Western Entities and the Aspen Entities.

3. Relevant information relating to the Western Entities' assumption of the debts that the Aspen Entities owed Plaintiffs in connection with the Aspen Village project.

4. Relevant information relating to the calculation of principal, interest, or fees for or amounts advanced or loaned to any of the Aspen or Western Entities in connection with the Aspen Village project.

5. Relevant information relating to any mortgages or other agreements securing Plaintiffs' interest in the Aspen Village project, the McKenzie Lane project, or any other project at issue in this lawsuit, and any subsequent modification, transfer, or assignment of those mortgages or security interests.

6. Relevant information relating to liens placed on any of the homes or properties associated with the Aspen Village project.

7. Relevant information relating to the failure to execute the collateral mortgage, assignment of collateral mortgage, assignment of leases and rents, or other documents

associated with Amendment No. 3 to the Credit Agreement between Plaintiffs and the Western Entities.

8. Relevant communications between or among Plaintiffs, the Western Entities, or the Aspen Entities related to the Aspen Village project.

9. Relevant information relating to the transportation, manufacturing, installing, constructing, affixing, setting, finishing, marketing, selling, purchasing, maintaining, or repairing of any of the homes or properties associated with the Aspen Village project.

10. Relevant information relating to warranty, installation, or service requirements from all vendors with respect to flooring, plumbing, fixtures, pipes, water heaters, electrical, trusses, or other home components for any of the homes or properties associated with the Aspen Village project.

11. Relevant information relating to costs incurred for the transportation, manufacturing, installing, constructing, affixing, setting, finishing, marketing, selling, purchasing, maintaining, or repairing of any of the homes or properties associated with the Aspen Village project.

12. Relevant information relating to any actual or claimed manufacturing or construction defects in any of the homes or properties associated with the Aspen Village project.

13. Relevant information relating to the qualifications, experience, skill, or knowledge of employees, contractors, or vendors who performed work on any of the homes or properties associated with the Aspen Village project.

14. Relevant information relating to communications or contracts between or among Plaintiffs, the Aspen Entities, or the Western Entities and any third-party dealers or

contractors relating to any of the homes or properties associated with the Aspen Village project.

15. Relevant information relating to any rebates and service fees on any of the modular home units associated with the Aspen Village project.

16. Relevant information relating to the collection, calculation, or disbursement of proceeds from the sales of any of the homes or properties associated with the Aspen Village project.

17. Relevant information relating to the payment of invoices or requisitions for any of the homes or properties associated with the Aspen Village project.

18. Relevant information relating to payments made or due and owing for work performed on any of the homes or properties associated with the Aspen Village project, including, but not limited to, payments made for work that was not completed or was inadequately done.

19. Relevant information relating to payments or reimbursements made to the Western Entities for amounts paid for the transportation, manufacturing, installing, constructing, affixing, setting, finishing, marketing, selling, purchasing, maintaining, or repairing of any of the homes or properties associated with the Aspen Village project.

20. Relevant information relating to any amounts due to the Western Entities from any of the Aspen Entities under any agreement or contract between them.

21. Relevant information relating to the steps taken to market, maintain, repair, or sell any of the homes or properties associated with the Aspen Village project.

22. Relevant information relating to the status of all modular home units, homes, or properties associated with the Aspen Village project, including, but not limited to, the

current estimated value of each modular home unit, home, or property; any and all person(s) or entities that currently hold title, right, interest, or ownership of each such modular home unit, home, or property; any and all liens, including amount and the person(s) or entities that hold such lien, for each such modular home unit, home, or property; any and all efforts to sell or market each such modular home unit, home, or property; any actual, anticipated, or pending sales of each such modular home unit, home, or property; the terms and condition of any offers to purchase each such modular home unit, home, or property; and the anticipated net sale proceeds for any and all person(s) or entities with title, ownership, or any interest in each modular home unit, home, or property, as a result of any actual, anticipated, or pending sales of each such properties.

## RECIPROCITY

This Court hereby expresses a willingness to provide similar assistance to the judicial authorities of Canada and the Province of Saskatchewan.[4]

---

4. There are currently several actions relating to the Aspen Village project and involving the same parties pending in Saskatchewan. *See, e.g.,* QBG 2027 of 2017 (Judicial Center Regina) (Larson bringing an action against AmeriCan, alleging, among other things, that McKenzie Lane condominiums had liens on them when AmeriCan transferred them to Larson in November 2016); QBG 2404 of 2017 (Judicial Center Regina) (involving the Aspen Entities' claim against AmeriCan and Larson that the McKenzie Lane condominiums were wrongfully transferred); QBG 2616 of 2017 (Judicial Center Regina) (involving Western's claim against one of the Aspen Entities for breach of Modular Home Sales Agreement); QBG 2168 of 2018 (Judicial Center Regina) (involving a claim against Larson and AmeriCan that the McKenzie Lane condominiums were wrongfully transferred).

## REIMBURSEMENT FOR COSTS

This Court hereby expresses a willingness by defendants to reimburse judicial authorities of Canada and the Province of Saskatchewan for costs incurred in executing this Court's letters rogatory.

Dated this 13th day of March, 2019.

By: _____
The Honorable Veronica L. Duffy
United States Magistrate Judge
District of South Dakota
Southern Division
Sioux Falls, South Dakota
United States of America